## 12029

### FOXWORTH v. MURCHISON NATIONAL BANK

#### (134 S. E., 428)

1. MORTGAGE.—Mortgagee consenting to reservation of issue of priority of its claim until after sale *held* not in position to refuse compliance with its bid for property at foreclosure sale, on ground that question of priority was undetermined.

2. MORTGAGES.—Rule to show cause is appropriate means of enforcing compliance with bid for property at mortgage foreclosure sale.

3. ATTORNEY AND CLIENT—ATTORNEY HELD TO HAVE EXPRESS AUTHORITY TO BID IN PROPERTY AT MORTGAGE FORECLOSURE SALE AT A PRICE SUFFICIENT TO PROTECT CLIENT'S INTEREST.—Attorney, appearing in mortgage foreclosure proceedings for bank which was insisting on security of mortgage, *held* to have express authority to do whatever was necessary for protection of bank's interest, and authorized to bid in property at an amount sufficient to satisfy claims secured by mortgage.

4. PRINCIPAL AND AGENT.—Generally principal will be held to have ratified unauthorized act of agent, unless he disaffirms it within a reasonable time.

5. ATTORNEY AND CLIENT.—Rule respecting ratification of unauthorized acts of agent or estoppel to deny agent's authority applies to unauthorized acts of attorney on behalf of client.

6. ATTORNEY AND CLIENT.—Authority of attorney or ratification of his unauthorized acts may be inferred from circumstances.

7. PRINCIPAL AND AGENT.—Repudiation of agent's unauthorized act must be communicated to party with whom agent dealt, not merely to agent.

---

NOTE.—On ratification of the unauthorized act of agent by silence, see note in L. R. A., 1918C, 222; 21 R. C. L., p. 930; 3 R. C. L. Supp., p. 1204; 2 R. C. L., p. 977.

8. ATTORNEY AND CLIENT.—Bank *held* to have ratified bid of its attorney at mortgage foreclosure sale by unreasonable delay in disaffirming it, irrespective of express or implied authority of attorney to make bid.

9. APPEAL AND ERROR.—Order of Trial Court, withdrawing and substituting paragraph of proposed case relating to effect of correspondence, in settling case for appeal, *held* proper.

Before MANN, J., Marion, April, 1925. Orders appealed from affirmed.

Petition by W. S. Foxworth for a rule requiring the Murchison National Bank to show cause why it would not comply with the bid of L. M. Gasque, its attorney, for property in a mortgage foreclosure sale, in a suit by the National Park Bank against O. G. Minshew and others. From orders making the rule absolute and setting the case on appeal, the Murchison National Bank appeals.

The following are the orders of M. M. MANN, Presiding Judge, appealed from, and petition for rehearing which was denied:

"ORDER

"Pursuant to petition in the above-entitled cause by W. S. Foxworth, assignee of the rights of the plaintiff, the National Park Bank, an order was granted on April 15, 1925, requiring the defendant, Murchison National Bank, to show cause before the Court at Marion on April 27, 1925, why it should not be required to comply with its bid for a house and lot in the town of Marion sold under decree of foreclosure and sale on March 2, 1925. Hearing was had on the moving papers, the proceedings in the original cause, the separate returns of Murchison National Bank and L. M. Gasque, Esq., its attorney in the foreclosure proceedings, and various verbal admissions and statements of counsel supplementing and in support of the petition and the returns.

"On March 15, 1920, O. G. Minshaw executed and delivered to the Planters' Bank of Marion his promissory note for $4,500, payable on March 15, 1921, and to secure its payment at the same time executed and delivered a mort-

gage covering a house and lot in the town of Marion. This note was renewed from time to time, and on September 1, 1924, O. G. Minshew executed and delivered a renewal note for $2,250, payable on December 1, 1924, which the Planters' Bank attached to the mortgage, and forwarded with the mortgage and the original note for $4,500, marked 'Paid by Renewal,' to the National Park Bank as security for a loan then obtained. Thereafter on September 29, 1924, O. G. Minshew executed and delivered to the Planters' Bank still another note, as a renewal of the remainder of the original indebtedness for $3,347, payable on March 1, 1925. This note was forwarded without any apparent security to Murchison National Bank of Wilmington, N. C., as security for advances obtained from Murchison National Bank, but the National Park Bank, the actual holder of the mortgage, claims it had no knowledge of any indebtedness secured by the mortgage when it made its advances other than the note of $2,250 attached to the mortgage when received by it.

"On December 19, 1924, the indebtedness to the National Park Bank being past due, through its attorney, M. C. Woods, Esq., it instituted an action for the foreclosure of its mortgage in the Court of Common Pleas of Marion County against O. G. Minshew, L. D. Lide, attorney, Murchison National Bank, the Planters' Bank, Bank of Aynor, and O. J. C. Rose, defendants, setting up its mortgage and alleging that the defendants other than O. G. Minshew, the mortgagor, claim some interest in the mortgaged premises junior to the lien of the plaintiff. Murchison National Bank through its attorney, L. M. Gasque, Esq., filed an answer setting up its note and alleging that it also was secured by the mortgage held by the National Park Bank. In the hearing of the case, the National Park Bank contended that it had a first lien upon the mortgaged premises to the amount of its indebtedness, while Murchison National Bank insisted that it was entitled to have the proceeds

of sale of the mortgaged premises paid to it and to National Park Bank in proportion to the amount of the indebtedness to each.

"The action for foreclosure resulted in a consent decree whereby it was adjudged that the mortgaged premises be sold on sales day in March, 1925, and that, in view of the fact that the mortgaged property would probably bring enough to pay both the National Park Bank and the Murchison National Bank, the question of priority be left open for future determination, thereby in effect transferring the controversy to the proceeds of the sale; it being apparent that the question might become academic if the proceeds of sale should be sufficient to pay both debts.

"Pursuant to this decree, after due advertisement, the property was offered for sale on March 2, 1925, by the Probate Judge of Marion County, the duties of the Master in Marion County having been devolved by statute upon the Probate Judge. On the day of the sale, L. M. Gasque, Esq., representing Murchison National Bank, approached M. C. Woods, Esq., representing the National Park Bank, seeking an understanding as to the bidding and suggesting the propriety of some concert of action between the National Park Bank, and Murchison National Bank, but Mr. Woods expressed his unwillingness to make any agreement, and stated that each party would have to look out for himself. When the sale was called, there were only two bidders, Mr. Woods, representing the National Park Bank, and Mr. Gasque, representing Murchison National Bank. The first bid placed upon the property was that of Mr. Woods for $100, and Mr. Gasque and Mr. Woods continued to bid against each other until Mr. Gasque placed a bid of $6,500, which was the highest and last bid. No one else made a bid. The property was thereupon sold to Mr. Gasque, as attorney for Murchison National Bank, for $6,500, which was within a few dollars of enough to pay both debts, together with costs and past-due taxes.

"Thereafter National Park Bank assigned all of its rights in the foreclosure proceedings, including its share of the proceeds of sale, to W. S. Foxworth, who has made repeated demands upon Murchison National Bank that it comply with its bid, but having failed to comply on the petition of W. S. Foxworth, Murchison National Bank, on April 16, 1925, was served with an order requiring it to show cause before me in Marion on April 27, 1925, why it should not be required to comply with its bid.

"The return of Murchison National Bank, filed in its behalf by R. B. Scarborough, Esq., for cause why it should not be required to comply, alleges three grounds: (1) That a compliance cannot be required until the issue of priority of payment is settled by the Court; (2) that L. M. Gasque, Esq., had no authority to bid in the property for it; and (3) that it cannot be required to comply with its bid on a rule to show cause, but is entitled to a jury trial upon the issues presented by the rule and the return. L. M. Gasque, Esq., filed a separate return, alleging his purchase of the property for Murchison National Bank and his authority so to do, attaching to his return certain correspondence between himself and Murchison National Bank.

"Since Murchison National Bank consented to the decree of foreclosure and sale of the mortgaged premises, reserving the issue of priority until after the sale, it cannot be heard to object to a compliance on the ground that the question of priority is undetermined. Equally untenable is its contention that it cannot be required to comply with the bid by rule to show cause. This, it appears, is the usual and the approved practice, and, since the decree contains no provision for a resale, in case of noncompliance, it may well be doubted if the matter can properly be brought before the court in any other way. *Chemical Company v. McLucas,* 87 S. C., 350; 69 S. E., 670; *Calder v. Maxwell,* 99 S. C., 115; 82 S. E., 997; *White v.*

*Brown,* 131 S. C., 71; 126 S. E., 750, filed February 27, 1925.

"The only serious question presented for considera-
tion is whether or not Murchison National Bank
can be required to comply with the bid made by its
attorney, L. M. Gasque, Esq.; it being contended that Mr.
Gasque neither had any implied power to bind the bank
growing out of the relation of attorney and client nor any
express power conferred by his client.

"To sustain the contention as to the want of implied
power, reliance is placed upon the cases of *Mayer v. Blease,*
4 S. C., 10; *Gilliland v. Gasque,* 6 S. C., 406; *Mordecai v.
County of Charleston,* 8 S. C., 100; *Ex parte Jones,* 47
S. C., 393, 25 S. E., 285; *Dixon v. Floyd,* 73 S. C., 202; 53
S. E., 167.   None of these cases, however, are directly rele-
vant to the specific point made.   It may be conceded, as it
must be, that in a suit at law upon a money demand the
authority of the attorney ends with the entry of judgment,
except merely to collect the money and enter satisfaction of
the judgment, and also that an attorney has no implied
power to assign his client's demand, yet none of these cases
decide or consider the extent of the implied power of the
attorney in relation to the sale of the mortgaged property
in a foreclosure proceeding.

"There are evident differences between a suit at law to
establish a money demand and a proceeding in equity to
foreclose a mortgage.   The sole object of the suit at law on
a money demand is to establish the debt and to obtain pay-
ment of the money in satisfaction of the judgment; it has
no direct relation to specific property either real or personal,
while in an action to foreclose a mortgage of real estate the
purpose of the proceeding is to defeat the mortgagor's
equity of redemption by establishing the liens upon specific
property, settling their priority, selling the property for the
payment of the lien debts, and finally making settlement
through the officer of the court conducting the sale.   The

controlling purpose of the action of foreclosure is to subject specific property to the payment of the debt and to collect such debt by sale. The object of the action is thus stated in the case of *Ex parte Jones*, 47 S. C., 393; 25 S. E., 285: 'In this case the very object of the suit in foreclosure was to settle the priority of liens on the mortgaged property, and to sell the property for the payment thereof.'

"While not necessarily controlling, yet the custom of business as to what by common practice usually is expected of an attorney in the foreclosure of a mortgage of real estate may not be wholly ignored. As a general proposition, when an attorney is employed to foreclose a mortgage of real estate, he is expected, and it is the common practice at the bar of this State, not only to represent his client to the point of obtaining a decree of foreclosure and sale, but also to attend the sale, to see that his client's interest is not sacrificed or defeated, to make settlement with the officer conducting the sale, and to obtain a report and an order confirming the sale. If necessary to the protection of his client's interest, it is usual for the attorney to participate in the sale; indeed he would be derelict in his duty should he permit property to be bought for a grossly inadequate amount which would result in his client receiving nothing upon his demand. It is true that an attorney would not be warranted in making an investment for his client by making a purchase beyond the extent of the client's interest, but, when he protects his client's interest only to the extent of this interest, it is not a case of an attorney making an investment for his client, but rather the protection of an investment already made by the client himself.

"In a law case on a money demand, there is a final determination of the action upon the entry of judgment, but in an equity case involving the sale of real estate, there is no final or complete determination of all matters within the scope of the action until a sale and an order confirming the report of the sale. *McIver v. Thompson*, 117 S. C., 195; 108 S. E.,

411. The scope of the action is comprehensively stated by the Court in the case of *Smith v. Cunningham,* 59 Kan., 552; 53 P., 760, as follows:

" 'In a large number of cases the entry of judgment ends the litigation, but in foreclosure proceedings it would seem that the end of the litigation is not reached until the lien is enforced by the sale, and confirmation of sale, of the mortgaged property. The understanding of the profession is that the duties and powers of an attorney continue until the final conclusion of the foreclosure proceedings. Such proceedings are not concluded by a decree directing a sale of the property, nor has an additional retainer or new contract with an attorney to represent his client in the proceedings subsequent to the decree ever been deemed necessary. In such a case the attorney originally employed would be deemed derelict in his duty if he failed to protect the interests of his client by examining the circumstances of the sale and every step taken in enforcing the lien.'

"It is therefore apparent that the scope of an action for the foreclosure of a mortgage of real estate is more extensive than the scope of a suit at law on a money demand. In the case of *Cauthen v. Cauthen,* 76 S. C., 226; 56 S. E., 978, it is held that the client is bound by the action of his attorney in relation to all matters within the scope of the action, and it would seem necessarily to follow that in an action for the foreclosure of a mortgage of real estate the client is bound by the action of the attorney, not only in establishing and settling the priority of the liens, but also in subjecting the mortgaged property to his client's debt, provided the client be not committed beyond the amount of his investment.

"Applying these considerations to the conduct of Mr. Gasque, it cannot be doubted that he acted in the utmost good faith; indeed his good faith was expressly conceded by counsel for Murchison National Bank in the hearing before me. Prior to the sale, upon discovering that the junior

mortgagee would not protect his mortgage, Mr. Gasque sought an understanding with the attorney of National Park Bank, but was unable to obtain any understanding, being informed that each party must look out for himself; and he was confronted with the knowledge that there was no way for his client to receive any payment upon his indebtedness except out of the mortgaged property. The first bid placed upon the property was that of his client's adversary for $100, which was less than sufficient to cover the costs of the case and taxes. Had he not competed in the bidding, his client would have received nothing, and he would now probably be facing charges of dereliction of duty before the grievance committee of the South Carolina Bar Association. Had Mr. Gasque bid an amount in excess of his client's interest, a different question would be presented, but he did not bid in excess of the investment already made by the client. It was not making an investment for the client, but the protection of an investment already made by the client himself. Under these circumstances it would be a harsh judgment to condemn his action and place him in the position of having transcended his duty to his client.

"Whatever may be the true rule as to the implied powers of an attorney, if indeed a hard and fast rule would be desirable without regard to the exigencies of peculiar circumstances unexpectedly arising, still, under the peculiar fact of this case, I do not deem it necessary to rest my conclusions wholly upon the ground that the action of the attorney was within his implied power. From the correspondence between the parties, I am of the opinion that Mr. Gasque was well warranted in concluding he had express power to do whatever was necessary in his judgment to protect his client's interest, and I think it was an inference which might properly be drawn by a man of ordinary reason and perception.

"On December 24, 1924, Murchison National Bank addressed a letter to Mr. Gasque, inclosing acceptance of

service of the summons and complaint in the case, and directing him to take whatever steps were necessary in answering the complaint inclosed, the last paragraph of the letter being as follows: 'In view of the fact that the National Park Bank of New York holds the security to notes held both by us and by them, naturally we wish to participate to the extent of our pro rata share in the foreclosure proceedings.'    This letter was acknowledged by letter of December 25th, requesting copy of the papers of Murchison National Bank, and saying: 'Please let me have these at once, and, upon receipt of same, I will prepare the answer in both cases, and follow them to a termination, looking after your interest in same.'    This letter was acknowledged by letter of December 27th, inclosing the papers requested, and there was no disclaimer of Mr. Gasque's understanding of his authority to follow the matter to a termination, looking after his client's interest in the same.    By letter of December 31st, Mr. Gasque forwarded copy of his answer, 'that you may see what we set forth in your interest.'    By letter of January 24th, Mr. Gasque informs his client that the case has resulted in a reference, and a decree for foreclosure, that he is informed that a subsequent mortgagee, Mr. Lide, will in all probability protect the senior mortgages, and that as to this he will keep the bank posted also.

"From this correspondence, which is only a small portion of the correspondence between the parties, but sufficient to throw light upon their understanding, it will appear that Mr. Gasque understood that he had plenary authority to follow the matter to a termination and to do all that was necessary in the interest of his client, and, although given express notice of this understanding, the client never at any time repudiated it.

"By the letter of January 24th, Murchison National Bank was informed that a decree for foreclosure had been obtained, and the bank could not have had more explicit notice that a sale would result, and that Mr. Gasque assumed that

he would be expected to do whatever was necessary to protect his client in that regard. It is true, as is earnestly urged by the bank, that Mr. Gasque spoke of the probability of a junior mortgagee protecting the senior mortgages, but this was suggested, not as a fact, but only as something which might occur; yet this could not definitely be ascertained until the sale. It is also earnestly urged by the bank that Mr. Gasque said he would keep it posted, and that he failed to do so, but this suggested lapse by the agent in the performance of his duty to the principal cannot be urged to the detriment of third parties who did not employ the agent and are interested in having the sale confirmed.

"In view of the entire correspondence between the parties and the surrounding circumstances, I cannot escape the conviction that the most reasonable inference to be drawn therefrom is that Mr. Gasque had express authority to do whatever was necessary in his judgment to the protection of his client's interest, and upon the entire record, I am constrained to conclude that the preponderance of the evidence establishes express authority for the action of Mr. Gasque.

"It is further suggested with much force that Murchison National Bank assumes an impossible position. It contends that the bidding of Mr. Gasque was wholly without effect, just as if he had not bid at all; this view being expressly conceded by counsel in argument. If this be true, then it necessarily follows that the only *bona fide* bid on the mortgaged property was that of $100 by the National Park Bank. Hence, to follow the argument of Murchison National Bank to its logical conclusion, the property must be awarded to W. S. Foxworth, the assignee of the National Park Bank, for $100, and he declares his willingness to comply, yet Murchison National Bank refuses to accede to this proposition. It therefore will neither surrender its bid nor yet will it accept it. Looking at the issue from another angle, had his attorney not entered a bid, the property would have gone to National Park Bank for less than

costs and taxes; and the security in so far as Murchison National Bank is concerned, would have been gone irrevocably. That it still has any interest in the property, or any security for its debt, is due to the vigilance of its attorney. For the bank to hold this benefit with one breath, and repudiate the means that brought this beneficial situation about with the other—the hand of Esau and the voice of Jacob— does not appeal to any sense of justice.

"One put to the choice between two inconsistent positions is required to elect, to take either one or the other. He cannot temporize to the detriment of others, and in no event should he be permitted to play fast and loose, or, as somewhat graphically expressed by counsel for petitioner, 'blow hot and cold,' with the Court on the orderly administration of the law. Even conceding that Mr. Gasque had no authority to bid so as to bind Murchison National Bank, yet, upon being informed that its agent had gone beyond what it now claims was his authority, it was its duty within a reasonable time either to ratify or to disclaim the action of its agent. The one thing it could not do was neither to ratify nor disaffirm, while at the same time holding to each alternative in order to affirm if advantageous and reject if not advantageous. As a general rule under such circumstances the principal will be held to have ratified the unauthorized act of the agent, unless he disaffirm it within a reasonable time. This is based upon elementary principles of good conscience and fair dealing.

"The rule has been stated as follows: 'As a general rule, the principal upon learning of the unauthorized act of his agent, if he does not intend to be bound thereby, must within a reasonable time repudiate it. It has been variously stated that the principal should repudiate the act promptly, immediately, at once, or as soon as informed or notified of the act; but the rule usually applied is that of a reasonable time, what is a reasonable time being dependent upon the circumstances of the particular

case, which may be such on the one hand as to require prompt or immediate action, or on the other hand as to make some delay excusable or immaterial.' 31 Cyc., 1275.

" 'With regard to the effect upon a client of acts of his attorney done without express authority, the usual rule as to such acts of agents applies, and under some circumstances the client will be held to have ratified the unauthorized acts of his attorney or to be estopped to deny the latter's authority. The authority of an attorney, or a ratification of his unauthorized acts, may be inferred from circumstances, as for instance, from the silent acquiescence of the client for a long period, or from the client's acceptance and retention of the fruits of the unauthorized act of the attorney:' 2 R. C. L., p. 977.

" 'If a company is informed of the borrowing of money by its agent, in its name, and within a reasonable time thereafter fails to disavow such acts of its agent, the jury are authorized to consider the company as assenting to what was done in its name.' *Union Gold Mining Co. v. National Bank,* 96 U. S., 640; 24 L. Ed., 649 (syllabus).

"The repudiation must be communicated to the other party to the transaction, and not merely to the agent. *Bement v. Armstrong* (Tenn. Ch. App.), 39 S. W., 899.

"In the case of *Ex parte Jones,* 47 S. C., 393, 25 S. E., 285, one of the grounds for sustaining an alleged unauthorized act of an attorney was the fact that the transaction complained of had been communicated by the attorney to his client, on the day of its consummation, and the action of the attorney had not been repudiated.

"On March 3, 1925, Mr. Gasque wrote Murchison National Bank full particulars of the sale. To this letter the bank replied on March 5th, 'As we seem to have ample security to cover the indebtedness to us of the Planters' Bank, we prefer not buying unless there is a very decided advantage to us in doing so and very good prospects for an

immediate sale,' and this contradicts the purpose expressed in this letter of December 24, 1924. In the same letter inquiry is also made as to the value of the property with a request for full information. On March 7th, Mr. Gasque replied fully, explaining that he was compelled to purchase the property in order to protect the bank's interest, that, if the bank does not accept the bid, he will have to have it resold and let some one else take the bid, suggests sending check in order to comply with the bid, and also says: 'If you do not want to do this, I am inclosing you a release and waiver of your rights under it, which I will thank you to sign and return to me so I can dispose of it in another way. If you will release your rights to it, of course I will turn it over to the receiver of the Planters' Bank, and let them get as much as they can, feeling that they have an equity in it. Please give this your immediate attention.' On the same day, March 7th, the bank wrote Mr. Gasque, stating that after careful consideration 'it seems to us that it will be best for us not to undertake to buy the Minshew property.' However, it does not release its claim to the bid, but suggests the advisability of taking its chances and collecting what it can out of what may be paid by some one else, and asks the advice of Mr. Gasque as to what in his opinion could be collected under that plan. The matter is thus still left undecided. On March 9th, the bank replies to Mr. Gasque's letter of March 7th, entirely ignoring the suggestions therein contained, but requesting further information.

"Mr. Gasque replied to this letter March 10th, as follows: 'The situation is just this, I bid off the property as attorney for you at $6,500, and the Park National Bank, together with the Court cost, is demanding of me a compliance, and to finance the claim would require an outlay of money that I am not willing to put out and have you to claim a payment of the difference, but I must comply one way or the other, and with that in view I want you to either send this money and take title to yourself or release me from having

to pay any difference on your notes.   Will thank you to let
me have reply at once.'

"To this letter the bank replied on March 13th, that it
felt it should have been consulted before the purchase was
made, but that it was unwilling to give up any security.
Mr. Gasque replied on March 14th, specifically demanding
that the bank take a definite position as to compliance with
the bid one way or the other.   The language of this letter is
as strong as possible and is as follows:  'I am sorry that I
am about to be embarrassed in this matter, but feel as if
I have done what I thought to be your interest, and now
must ask that you either comply or release me from it, and,
if not, I will have to have the Court to resell the property
on May salesday, and, as it will bring what is due to the
other parties, I see no reason that would cause you to claim
anything above.   I am returning to Columbia to the Legis-
lature on Monday, and will ask that you kindly write me at
that point upon receipt of this letter, either taking this prop-
erty or releasing me from the bid for you, so I can finance
it by some one else; or, if you desire to repudiate my offi-
cial record as your attorney, why, do that so I will know
how to proceed.  *  *  *  However, let me know exactly
what you intend doing, so I will know how to proceed.'

"On March 17th, the bank replied, still without taking
any definite position either way, but requesting information
as to the probable effect of reselling the property, or of
turning it over to other bidders.   To this Mr. Gasque on
March 18th, replied, requesting the bank in the strongest
terms to take a definite position one way or the other, the
language of the letter being as follows:  'As the situation
stands now, you will either have to take title and pay the
Probate Judge the amount I sent you, or refuse to comply, in
which event, while very embarrassing to me, I will have to
report to the Probate Judge and have the property resold
next salesday, and, if that is done, some one would have to

represent you in making it bring your notes or you would be in no better situation than you are to-day.'

"In the face of repeated and urgent requests by Mr. Gasque that the bank take a position one way or the other, and that, if it desired to repudiate his authority as attorney, to do so in order that he might know how to proceed, it takes no position, but holds the negotiations open and temporizes. In the face of demands by the assignee of the plaintiff in the cause it maintains silence. It communicates no word of explanation to the officer of the Court making the sale. It assumes no definite position, until brought before the Court and forced to give a definite reply only a few days less than two months after the event.

"There is only one reasonable inference to be drawn from these facts, and that is that the bank for an unreasonable time assumed to hold its decision in suspense so that at its own choice it could hold to the bid, or reject it as to its interest might seem best. A purchaser at a judicial sale cannot thus trifle with the Court, and Murchison National Bank by its conduct has in good conscience become bound by the bid of its attorney, even conceding it beyond the warrant of his agency either express or implied.

"Its return in my opinion being insufficient, the rule should therefore be made absolute, and Murchison National Bank should be required to comply with the bid of its attorney, L. M. Gasque, Esq., by forthwith paying into the hands of the Judge of Probate of Marion County the sum of $6,500, with interest from March 2, 1925, at the rate of 7 per cent. per annum, and it is so ordered.

"No expression as to fact, or finding thereon, or determination of any issue pertinent to the question immediately before the Court, is to be construed as prejudicial to, or in any wise affecting the rights of the parties in the ultimate question of priorities, or rights in the fund derived from the sale of the premises mentioned.

"APPENDIX

"Appellant's and respondent's attorneys not having been able to agree fully on case on appeal—pursuant to Rule 5 of this Court, it was submitted to Judge M. M. Mann for settlement and his order follows:

"This matter comes before me at this time under the rule requiring the Trial Judge to settle the case on appeal when attorneys therein cannot agree on the same.

"Attorneys for the respondent Gasque object to the following paragraph in the proposed case:

" 'Appellant had no notice of the sale until advised of it by respondent Gasque by letter dated March 3, 1925, and to which it promptly replied on March 5, 1925, advising him that it did not want to take the property and later, on the 7th of March, the day on which he asked to hear from the appellant, it notified him positively that it was not interested and that it did not approve of his action in buying it.'

"Such a construction of the letters mentioned, taken alone, permits of a view contrary to that of the Trial Judge on the case as a whole. I do not see how these letters can be separated from the entire correspondence and independently considered without doing serious harm to the intelligence conveyed in the other portions of the correspondence. In fact, the entire chain of correspondence is so intimately related, so vital as a whole in considering the question at issue, that I do not see how any one or group of letters can be separately considered. In order to arrive at the full relationship of Gasque and appellant, their reciprocal duties, and their attitude toward each other and their respective duties in the premises, the whole correspondence must be carefully studied and considered as a unit. That is the way the Trial Judge considered it, and that is the way he prefers that the Supreme Court should be asked to consider it.

"Therefore, let the paragraph come out and let the following be substituted in lieu thereof:

" 'On March 3, 1925, respondent Gasque advised appellant by letter of the sale, and it is from the date of this letter and the receipt thereof until the issuance of the rule to show cause that we find Gasque and appellant in controversy over the question at issue. The correspondence between them sufficiently states the issue, and, since the Court will be called to draw serious inferences and conclusion therefrom, no synopsis or abbreviated digest. of the contents of this correspondence is here given.'

"And it is so ordered."

"Petition for Rehearing under Rule 17.

"The petitioner, Murchison National Bank, appellant in the above case, by J. W. Yates, its vice-president, respectfully shows:

"(1) That the decision herein was filed within less than ten days from the date hereof, to wit, on the 13th day of July, 1926, and the remittitur has not yet been sent down.

"(2) That your petitioner respectfully requests a rehearing herein under Rule 17 of this honorable Court, and upon the points and grounds hereinafter stated, to wit:

"(a) Because the uncontradicted written testimony set out in the printed case herein, and also the appellant's sworn return to the rule issued against it, specifically shows that appellant had no information as to the time or place of the foreclosure sale out of which this controversy arose, that it did not authorize, and for lack of knowledge could not have authorized its attorney, Gasque, or any other person to attend the said sale in its behalf, or purchase the property in question for it, therefore, that the finding of Judge Mann against appellant was contrary to the testimony; and it deferentially submits that this honorable court was not advertent to the said testimony, in the particulars mentioned, or it would not have affirmed the finding of the Circuit Judge in that particular.

"(3) It was held on circuit that this appellant played 'hot and cold,' neither accepted nor declined the bid which

respondent Gasque is alleged to have made, and your petitioner deferentially suggests that, in approving and adopting the conclusions reached by his Honor, Judge Mann, in this particular, the Court must have overlooked the uncontradicted fact that the appellant, upon learning of the sale, immediately, and without equivocation, advised the respondent Gasque, on March 5th and again on March 7th, following his notice of March 3d, that it would not accept the property he had undertaken to purchase for it, and had neither authorized the bid, nor would accept it.

"(4) It further deferentially suggests that the Court overlooked the admission of respondent Gasque, contained in his letters, offered as exhibits to appellant's return, that it was optional whether appellant accepted the unauthorized bid which he had made, and to the contrary clearly admitted its right to decline the bid. And the Court apparently overlooked the fact that clearly respondent had no express authority to bid, and that the law did not clothe him with implied authority.

"(5) It further deferentially submits that the Court overlooked the very important fact his Honor, the Circuit Judge, held in effect, that respondent Gasque not only had express authority to do whatever was necessary in his judgment, but that it was his duty, in this particular case, to purchase the property in question, and, in effect, that, had he failed to do so, he would have been liable to censure before the State Bar Association; the finding in the Circuit Court in the first particular being directly contrary to the testimony, and his finding in the other particular, neither a correct nor logical inference to be drawn from the circumstances, or a sound conclusion of law.

"(6) It further deferentially suggests that, in affirming the order of Judge Mann as a whole, the Court doubtless overlooked the fact that it was committing itself, not only to his conclusions unsupported by testimony, namely, that the letters offered in evidence showed (1) that Mr. Gasque

had express authority to bid for petitioner appellant, (2) that it had sufficient notice of the sale, (3) that petitioner declined either to accept or disaffirm the bid made on the property in question, but also to the legal conclusions reached by his Honor, Judge Mann, namely, that an attorney of record, especially in an equity case, has both actual and implied authority to purchase for his client, without instruction, property offered for sale in a case to which such client is a party, which ruling petitioner respectfully and deferentially submits was not in accord with the former decisions of this honorable Court, and it is loathe to believe that it was the intention of the Court to express an agreement with the ruling of the Circuit Judge on the issues of law presented by appellant in its exceptions and argument before the Court.

"Wherefore, your petitioner respectfully petitions that the remittitur herein be stayed and a rehearing ordered according to the practice of this honorable Court.

"July 20th, A. D. 1926.

"Murchison National Bank,
"By J. W. Yates, Vice-President.
"Robt. B. Scarborough,
"Attorney for Petitioner."

"Petitioner, Murchison National Bank, hereby stipulates and consents, that the stay of remittitur herein, if granted, shall be upon the condition that the status of the property involved shall not be disturbed until after the final determination of the case.

"July 20th, A. D. 1926.

"Murchison National Bank,
"By J. W. Yates, Vice-President."

*Mr. R. B. Scarborough,* for appellant, cites: *Rule to show cause not exclusive remedy:* 99 S. C., 115; 87 S. C., 350. *Implied authority of attorney after judgment entered:* 117 S. C., 195; 76 S. C., 226; 73 S. C., 207; 47 S. C., 393;

44 S. C., 10; 19 S. C., 554; 8 S. C., 100; 6 S. C., 409; 1 R. C. L., 1911; 6 C. J., 156; 3 A. & E. Enc., 2nd Ed., 329.

*Messrs. M. C. Woods* and *A. F. Woods*, for respondent, cite: *Rule to show cause proper remedy:* 131 S. C., 71; 99 S. C., 115; 87 S. C., 350. *Appellant estopped to object to compliance with bid:* 112 S. C., 89; 105 S. C., 206; 99 S. C., 310; 73 S. C., 202; 47 S. C., 393; 9 S. C., 281. *Implied powers of attorney in action on money demand:* 112 S. C., 89; 105 S. C., 206; 76 S. C., 226; 74 S. C., 16; 73 S. C., 202; 34 S. C., 533; 8 S. C., 100; 6 S. C., 406; 4 S. C., 10; 8 Rich., 468; 1 Hill, 184; 1 Bailey, 437. *Implied powers of attorney in action requiring sale of property:* 117 S. C., 195; 76 S. C., 226; 47 S. C., 393; 40 S. C., 114; 19 S. C., 554; 12 S. C., 488; 59 Kan., 552; 53 P., 760. *Respondent had powers of general agent in acting for appellant:* Harp. Eq., 166. *Ratification of unauthorized acts of agent:* 103 S. C., 494; 86 S. C., 8; 55 S. C., 568; 47 S. C., 393; 35 S. C., 42; 34 S. C., 533; 28 S. C., 134; 26 S. C., 581; 3 Rich. Eq., 281; 1 Bailey, 624; 230 F., 288; 150 U. S., 128; 37 L. Ed., 1025; 120 U. S., 256; 30 L. Ed., 639; 6 C. J., 670.

July 13, 1926.

On petition for Rehearing, August 23, 1926.

The opinion of the Court was delivered by Mr. Justice Blease.

The order of his Honor, M. M. Mann, Circuit Judge, in this cause is full and clear, and, in our opinion his finding and holdings are in accord with law, equity, and justice. Let the order be reported in full.

We also agree with the order of Judge Mann settling the case for appeal.

It is the judgment of this Court that both the orders appealed from be, and the same are hereby affirmed.

Mr. Chief Justice Gary and Messrs. Justices Watts and Stabler concur.

MR. JUSTICE COTHRAN (dissenting): This is an appeal from an order requiring the appellant, Murchison National Bank, to comply with what is alleged to have been its bid upon the sale, under foreclosure, of the property of one O. G. Minshew.

On March 15, 1920, O. G. Minshew gave to Planter's Bank of Marion, a note for $4,500, payable March 15, 1921, secured by a real estate mortgage upon a certain house and lot in the City of Marion. (Details of the note do not otherwise appear in the record.) The note was renewed from time to time. On September 1, 1924, Minshew gave the bank, in partial renewal of the $4,500 note, a note for $2,250, payable December 1, 1924. This note, with the mortgage, was assigned by the Planters' Bank to the National Park Bank of New York, as collateral security. On September 29, 1924, Minshew gave the bank, in renewal of the balance due on the $4,500 note, a note for $3,347, payable March 1, 1925. This note, with others, was assigned to the Murchison National Bank of Wilmington, N. C., as collateral security.

The $2,250 note, which had been assigned to the National Park Bank not having been paid at maturity, December 1, 1924, that bank, on December 19, 1924, instituted the main action for foreclosure. The parties defendant were Minshew, the Murchison Bank, Planters' Bank, Bank of Aynor, and O. J. C. Rose; each of the defendants other than Minshew was made a party as claiming an interest in the mortgaged premises junior to the lien of the plaintiff Park Bank. The Murchison Bank answered, setting up its note for $3,-347, which had been assigned as stated, claiming that that note, as well as the $2,250 note which had been asigned to the Park Bank, was secured by the mortgage which Minshew had given to the Planters' Bank to secure the orginal $4,500 note of which both notes were renewels, and that it was entitled to participate *pro rata* with the Park Bank, in the proceeds of the sale under foreclosure.

On January 26, 1925, a consent decree of foreclosure was

passed, fixing the date of sale on March 2, 1925, by the probate Judge of Marion County. It established the priority of the Park Bank mortgage over the claims of all of the defendants except the Murchison Bank. As to its claim to participate *pro rata* with the Park Bank in the proceeds of sale, the question was reserved for future determination; the contest as to this matter, between the two banks, was practically transferred to the fund arising from the sale. The sale was duly advertised and was had at the appointed time, March 2, 1925.

In all of the proceedings up to the point of the sale, the Murchison Bank was represented by L. M. Gasque, Esq., an honored member of the Marion bar. He was present at the sale, looking after the interests of his client. A spirited bidding ensued between the attorneys for the Park Bank and Mr. Gasque, attorney for the Murchison Bank. Mr. Gasque's bid of $6,500 was the last and highest bid, and the property was knocked down to him at that figure and charged to L. M. Gasque, attorney.

Subsequently, as will be explained in greater detail, the Murchison Bank denied the authority of Mr. Gasque to bid in the property for it, and declined to comply with the bid.

Thereafter the petitioner, W. S. Foxworth, who had been, perhaps then was, president of the Planters' Bank, with commendable appreciation of the situation, paid to the Park Bank the amount that was due to it on the $2,250 note and mortgage, and took an assignment of them from the Park Bank. He is the party now interested, in the place of the Park Bank.

After repeated but unavailing efforts to induce the Murchison Bank to ratify the act of Mr. Gasque and to comply with the bid, on or about April 13, 1925 (the petition is not dated in the record), Foxworth presented a petition setting forth the above situation, to his Honor, Judge Mann, asking for a rule upon the Murchison Bank,

to show cause why it should not comply with said bid. His Honor, Judge Mann, issued the rule to show cause, dated April 15, 1925, requiring a return at Marion, on April 27th. At the appointed time the matter was heard by his Honor, Judge Mann, upon the petition of Foxworth, the report of sales by the probate Judge, the return of the Murchison Bank, what is denominated the "return of L. M. Gasque" (although the rule did not require a return by him), accompanied by a mass of correspondence between Mr. Gasque and the Murchison Bank.

The gist of the return of the Murchison Bank is found in the following paragraph of the return:

"And it specifically alleges that it had no notice of proposed sale, was not consulted with reference thereto, did not directly or indirectly authorize him or any one else to bid for it, and that, if said Gasque did bid upon the said property at the sale thereof, as alleged, he did so at his own risk, it is not bound thereby, and has not directly or indirectly sanctioned, approved, or ratified the alleged action of the said Gasque in that behalf, that while it does not question the good faith of its said attorney, it alleges that he was without authority in the premises, and it is not bound by this action in that particular."

On May 13, 1925, his Honor filed an order adjudging that the return of the Murchison Bank was insufficient, and requiring it "to comply with the bid of its attorney, L. M. Gasque, Esq., by forthwith paying into the hands of the Judge of Probate of Marion County the sum of $6,500, with interest from March 2, 1925, at the rate of seven per cent. per annum."

From this order the Murchison Bank has appealed upon exceptions which fairly raise the questions herein considered and others which it is not deemed necessary to pass upon.

The evidence in this matter, upon which the Court is called upon to pass, presents a regretable controversy; but nothing in it, or in what we may have to say, can be con-

strued into the slightest reflection upon the integrity of a faithful officer of the State, and a member of the bar of this Court of the very highest character. No one can doubt but that he was actuated by the utmost loyalty to the interests of his client; the bank in its return concedes as much; but, if the bank sees fit not to respond to what may be considered an "imperfect obligation," and insists upon its legal rights, this Court would be untrue to itself and unjust to Mr. Gasque, if it did not fully accord such legal rights.

Reviewing the evidence, largely in correspondence between Mr. Gasque and the Murchison Bank, we find the following facts, which appear not to be at all controverted:

The foreclosure proceedings were begun on December 19, 1924; apparently the copies of summons and complaint intended for the Murchison Bank were mailed to that bank and service accepted; for the bank on December 24th enclosed the acceptances of service to Mr. Gasque, with the request that he take the necessary steps to answer the complaint, and calling his attention to their claim to participate *pro rata* with the Park Bank. On December 25th, Mr. Gasque acknowledged receipt of the papers, stating:

"I will prepare the answers in both cases [referring to another foreclosure also] and follow them to a termination, looking after your interest in same."

On December 31st, he notified the bank of the service of the answer.

On January 24, 1925, he notified the bank that, after a reference, the *Minshew case* had terminated in a decree of foreclosure. He did not in this letter notify the bank of the date of sale fixed in the foreclosure decree. The letter contained the following exceedingly significant statement:

"I am informed that a subsequent mortgagor (mortgagee?), to wit, Mr. Lide, will in all probability protect

your mortgage as well as (that of?) the Park National Bank.   In this matter I shall keep you posted."

That was the last communication Mr. Gasque made to the bank until after the sale of March 2d, although the date of the sale had been fixed in the decree of foreclosure, the sale had been duly advertised, and he had left the bank under the impression that Mr. Lide, a junior mortgagee, would in all probability, in order to protect himself, make the property bring enough to pay both banks, in which event it would of course be unnecessary for the bank to bid at all, of which probability he engaged to keep the bank posted. It does not appear that Mr. Gasque made any effort at all to confirm the information of the probability that Mr. Lide would do as he expected, until the moring of the sale, when he learned that Mr. Lide was not going to run the property up.  He then made an effort to reach an agreement with the attorneys for the Park Bank, but was unable to do so, the attorneys stating that each one must look out for himself.  It was then too late to confer with the bank and learn what they wished done in the unfortunate emergency created by the failure of Mr. Gasque in the meantime to communicate with them.  The bank was entitled to know when the sale was to take place; it was entitled to know whether Mr. Lide was intending to carry out the expectations of Mr. Gasque; it was entitled to the exercise of its own conception of what was to its interest, in view of the fact, which was known to Mr. Gasque, that it had other collateral than the Minshew note. When Mr. Gasque had from January 24th to March 2d, to acquaint the bank with conditions, during which period not a word or a line passed from him to the bank, it is too late to claim that on the morning of the sale, after he had ascertained that Lide did not intend to run the property up as he expected that he would do, and after he had failed to come to a *modus agendi* with the attorneys for the Park Bank, an emergency arose in which he, on account of

the emergency, was justified in acting as he thought best for the interest of his client. He may have been entirely right in so acting in the emergency, if the emergency had been of the bank's creation; but it was not so.

On March 3d, the day after the sale, Mr. Gasque notified the bank of the result of the sale. The letter is a weak statement of his claim now that he bid the property off under express or implied authority from the bank, for it. It is rather an acknowledgment of his want of authority, and an effort to have the bank confirm what he had done without it. He writes:

"The situation now is that I have bid off this property, and believing same to be worth the full amount I bid it off at, you can take title to the property and pay the Park National Bank the amount due them, and dispose of the property and get the difference to be applied to your note. In the meantime I desire to know whether or not you confirm my purchase at the sale for you of this property, for, if not, it being the only way I could protect you, I will have to either let it sell again," etc.

This proposition of confirmation of his authority contained a renunciation of the bank's claim to prorate with the Park Bank:

"You can take title to the property and pay the Park National Bank the amount due them, and dispose of the property, and get the difference to be applied to your note."

The bank had notified him at the very beginning of their claim to participate *pro rata* in the proceeds of sale, and he had engaged to protect that claim as far as he could. It is clear that, if the bank had accepted his proposition to confirm his bid, pay the money in Court, allow the Park Bank to receive the full amount of its claim and the remainder paid to the Murchison Bank, the latter's claim to prorate would have "melted into thin air."

If this proposition had been made to the bank by Mr. Gasque, before the sale, is it reasonable to suppose that

it would have been accepted? If he imposed this condition
after the sale, it is only reasonable to assume that he made
his bid with this condition in view, which is quite different
from the position now taken, that the bank is bound to
confirm his bid without any conditions.

On March 5th, the bank answered Mr. Gasque's letter
of the 3d, stating that as they appeared to have ample
security to cover the debt of Planters' Bank they preferred
not to buy unless there was a very decided advantage to
them in doing so and very good prospects for an immediate
sale; a very reasonable position. The bank did not
positively decline; they certainly did not positively accept;
but asked for full information as to the value of the
property, the prospect of a prompt resale, and the amount
due to the Park Bank.

Much is made of this letter in argument as an implied
ratification of Mr. Gasque's action. We do not see it in
this light at all. In neither of Mr. Gasque's letters of the
3d and 7th is there the slightest claim that the bank was
bound by this action. Both of them are but solicitations
and inducments to the bank to confirm. Why the necessity
of confirmation, if the bank was already committed? The
bank was in this position:. It had had no information of
the date of the sale. It had been led to believe that Mr.
Lide was going to run the property up. It had had no
information, which had been promised, to the contrary. It
had given Mr. Gasque no authority to bid off the property
for them, had had no reason to think that he contemplated
such action; on the contrary, the impression created by
him was that it would not be necessary. They were not
in the real estate business in a city in another State. They
had, as they thought, ample security outside of the Minshew
note. What objection could possibly be raised to their
entertaining the proposition of Mr. Gasque and refraining
from action until they were satisfied that it was to their
advantage to accept it, we cannot conceive, or how this can

be considered as a ratification of a plainly unauthorized act.

On March 7th the bank wrote Mr. Gasque declining to comply with his proposition. On the same day, Mr. Gasque replied to the bank's letter of the 5th, stating that the amount due the Park Bank was $3,187,27; describing the property; estimating its value normally at $6,000 to $8,000, but evidently of the opinion that, on account of local financial stringency, it would not be possible to immediately realize even the smaller figure; that the bank upon complying would have an equity of at least $2,000, by "of course having to hold it for a while." In that letter he made no claim that the bank was in any wise legally bound to take care of his bid; again renewed his proposition that the bank renounce its claim to participate *pro rata* in the proceeds of sale and continued:

"But if not confirmed by you (upon the terms he proposed), I will have to have it resold, or let some one take it and pay the Park National Bank and expenses on same, which would be an easy matter with the equity in it, therefore I will be glad for you to send me a check for this amount, to wit, $3,187.27. And I will have the deed made to you and placed on record; but if you do not want to do this, I am inclosing a release and waiver of your right under it, which I will thank you to sign and return to me so I can dispose of it in another way."

Accompanying that letter, was the form of release which Mr. Gasque proposed for the bank to sign. It was an acknowledgment that at the sale, Mr. Gasque, in bidding off the property, was acting as the agent of the bank, a fact that the bank has never acknowledged. It contained also a release of all interest of the bank in the proceeds of sale, the difference between the amount of the bid and the Park Bank's debt going to the receiver of the Planters' Bank which had assigned all of its interest in the second renewal note to the Murchison Bank, which bank was at

least entitled to a second lien upon the proceeds of sale. His first proposition was that the bank should renounce its claim to participate *pro rata* in the proceeds of sale. This proposition denied not only that possible right, but to any part of the proceeds after paying the Park Bank's debt.

On March 9th, the bank replied to Mr. Gasque's letter of the 7th, calling his attention to his former advice that they were entitled to participate *pro rata* in the proceeds of the sale, and expressing the apprehension, which appears well founded, that the Park Bank, under Mr. Gasque's proposition, was "being given the right of way over" them in the matter, and asking for further information.

On March 10th, Mr. Gasque replied to the bank's letter of the 9th, stating his fear that he was mistaken in the matter of prorating, and, by way of ultimatum, insisting that the bank either send the money of the Park Bank's debt, or sign the form of release which he had forwarded.

On March 13th, the bank replied to Mr. Gasque's letter of the 10th, reiterating its contention as to prorating, and stating that, although it had probably sufficient other collateral to protect its claim, there appeared no reason why, if it was entitled to any part of the proceeds of sale, it should release it, adding:

"Under the circumstances we would rather have taken our chances and accepted whatever might have been realized from the sale. It does not seem to us that the property should have been bid in for our account without some previous understanding. * * * We feel that we should have been consulted before this purchase was made."

On March 14th, Mr. Gasque replied to the bank's letter of the 13th, saying:

"I note what you state, especially that part of your letter referring that you *'should been consulted before this purchase was made.* The turn matters now seem to take, *I feel sure that I should have done this* (italics added), but relying upon what is customary," etc.

He reiterated the proposition that the bank release its interest in the proceeds of sale entirely, or send check.

On March 17th, the bank replied to Mr. Gasque's letter of the 14th, saying:

"While we appreciate your acting in the way which you thought for our best interest, we cannot feel that you should have gone to the extreme of purchasing this property without communicating with us. * * * If you had written or telephoned us that you expected to make this bid, we would have advised strongly against that action."

On March 19th, Mr. Gasque replied to the bank's letter of the 17th, practically repeating what he had previously written; reviewing his proposition that the bank release all interest in the proceeds of sale, release him from the obligation of his bid, or 'put up this amount of money." He closed by saying:

"Please advise whether you will follow. this plan or release my bid, and if not I shall proceed to have it advertised for another sale, which, while embarrassing to me as an attorney, will not cause the other parties to lose anything."

Whether he meant that the deficiency upon resale would be made up by the bank or by himself is not entirely clear.

In the meantime, Foxworth had had an assignment executed by the Park Bank of the interest of that bank in the judgment of foreclosure, and on March 24th he wrote to the Murchison Bank, suggesting a composition of the outstanding differences.

On March 25th, the bank replied to Foxworth's letter of the 24th, reiterating its position in the matter, and expressing a willingness to send its representative to Marion for a conference. No attention appears to have been paid to this letter, and on or about April 13th hostilities were opened by the presentation of the petition and the issuance of the rule to show cause dated April 15th.

That Mr. Gasque had no express authority to bid off

the property for the bank is conceded; that he had no implied authority, by reason of the fact that as attorney he had been representing the bank in the foreclosure proceedings, is concluded by the unanimous line of authorities upon this subject. *Savery v. Sypher,* 6 Wall., 157; 18 L. Ed., 822. *Bauman v. Eschallier,* 184 F., 711; 107 C. C. A., 44. *Beardsley v. Root,* 11 Johns. (N. Y.), 464; 6 Am. Dec., 386. *Fisher v. McInerney,* 137 Cal., 28; 69 P., 622, 907; 92 Am. St. Rep., 68; 2 R. C. L., 1011. *Averill v. Williams,* 4 Denio (N. Y.), 295; 47 Am. Dec., 252. *Foster v. Wiley,* 27 Mich., 244; 15 Am. Rep., 185; Note, 132 Am. St. Rep., 179. *Fisher v. Knox,* 13 Pa., 622; 53 Am. Dec., 503. *Mayer v. Blease,* 4 S. C., 10. *Gilliland v. Gasque,* 6 S. C., 406. *Ex Parte Jones,* 47 S. C., 393; 25 S. E., 285. *Dixon v. Floyd,* 73 S. C., 202; 53 S. E., 167; 6 C. J., 156. *LeConte v. Irwin,* 19 S. C., 554; 3 A. & E. Ency. L., 329. *Cauthen v. Cauthen,* 76 S. C., 226; 56 S. E., 978.

The evidence of ratification, after the sale, of Mr. Gasque's action is as conspicuous in its absence as the evidence of his express or implied authority. His letters, as has been seen, were importunities that the bank confirm his action; and there is not a particle of evidence tending to show their agreement to do so. The only circumstance upon which the respondent can place the least reliance, is that, in the first letter to Mr. Gasque after the sale, the bank expressed its possible willingness to accede to his request, if upon an investigation with full information that the property was worth $6,500 and could be promptly resold, it should be considered to their advantage to do so. Mr. Gasque's letter of March 7th placed the value of the property at from $6,000 to $8,000, and intimated very plainly that it could not be resold even at the lower figure, and not at all without waiting for better financial conditions. Before this letter was received, however, the bank, on the same day as Mr. Gasque's letter was written, positively declined to

buy. From that time on the bank was consistent in its declination.

It is suggested in the circuit decree that the Murchison Bank should not be allowed "to blow hot and cold," by disaffirming the authority of Mr. Gasque and at the same time claiming the benefit of his bid. The proceeding is against the bank, not against Mr. Gasque, and we see not the slightest evidence in the record before us tending to show that the bank is making any claim against him. For all that appears to the contrary, the bank is fighting off an attack against itself, in which Mr. Gasque and the Park Bank had joined forces; they appear to be satisfied with a judgment declaring their return sufficient and perhaps would consent to a resale of the property, under the circumstances exonerating Mr. Gasque from personal liability, if the Park Bank would extend the same consideration. In this proceeding they simply ask to be relieved from an obligation which they did not assume, did not desire to assume, and gave no authority to Mr. Gasque or any one else to assume for them. Whether Mr. Gasque may be held personally liable under the principles announced in the case of *Long v. McKissick,* 50 S. C., 218; 27 S. E., 636, at the suggestion of either the Park Bank or the Murchison Bank, is a matter foreign to this proceeding.

Even if the bank were here insisting that Mr. Gasque is personally liable, we see no inconsistency in so doing. If their position is sound, Mr. Gasque was unauthorized to bid in the property for them and was as a stranger to them.

It has been suggested also that the bank must be held to have ratified the action of Mr. Gasque, unauthorized though it may have been, by its failure to give notice to the Park Bank or its attorneys or Mr. Foxworth, of the disavowal of Mr. Gasque's action.

The position is reasonable, fair, and supported by the authorities, that a principal who seeks to disavow the action of his agent, must not only notify the agent but also a

third party who may suffer injury by the failure to do so
Mr. Mechem thus states the rule:

"Where a person assumes in good faith to act as agent
for another in any given transaction, but acts without
authority, whether the relation of principal and agent does
or does not exist between them, the person in whose behalf
the act was done, upon being fully informed thereof, must
within a reasonable time disaffirm such act, at least in cases
where his silence might operate to the prejudice of innocent
parties, or he will be held to have ratified such unauthorized
act." Mechem, Agcy. § 157.

"While it may be considered as evidence of a ratification,
it (silence or delay) is not conclusive, and it is held that
it cannot be conclusive unless the rights of innocent third
persons have been prejudiced thereby, or, in other words,
unless the case contains this element of equitable estoppel.
* * * If the acquiescence, silence, or delay on the part of
the principal has caused third persons, in reliance thereon,
to forego some right or act to their prejudice, he should
be held to have ratified the act of the agent. Cases of
this kind indirectly contain the element of estoppel, and some
of the decisions are expressly based wholly or in part upon
this ground." 31 Cyc., 1277.

In *Bement v. Armstrong* (Tenn. Ch. App.), 39 S. W.,
899, it is held that, where the agent authorized only to sell
goods, purchased goods from a third party, if the principal
would repudiate his act, he must give reasonably prompt
notice to such third party, although he may have promptly
disavowed the act to the agent.

"But where a person in good faith assumes to act as
the agent of another, but without authority in fact, in any
particular transaction, the latter, upon being fully informed
thereof, must, in cases where his silence might prejudice
the assumed agent or innocent third parties, disavow the act
within a reasonable time, or he will be held to have ratified
it." *Robbins v. Blanding,* 87 Minn., 246; 91 N. W., 844.

The third party who relies upon such a ratification assumes the burden of showing lack of notice and injury. It is incredible that under the circumstances the Park Bank, its attorneys and Mr. Foxworth were not informed of the failure of the bank to comply with the bid of Mr. Gasque. In his petition Mr. Foxworth avers that "repeated demands upon the defendant Murchison National Bank, to comply with its bid have been made, but it has failed and refused to comply." This was in the petition presented about April 13th. Prior to this Mr. Foxworth, in his letter to the bank dated March 24th, states that he had had Mr. Gasque's version of the matter. In the bank's letter of the 25th, they go fully into the explanation of their declining to recognize Mr. Gasque's authority: "Our position is that we feel that we should have been consulted before this property was purchased for our account." So far from sustaining the burden of showing that they had no notice of the disavowal, the evidence is conclusive that they did.

The order of his Honor, Judge Mann, will be incorporated in the report of the case.

The judgment of this Court should be that the order appealed from be reversed, and that the rule be discharged.

### ON PETITION FOR REHEARING

*Per Curiam.* On the petition for rehearing by Murchison National Bank, appellant, the following order was made: "Petition for rehearing denied."

MR. CHIEF JUSTICE GARY and MESSRS. JUSTICES WATTS, STABLER and BLEASE concur.

MR. JUSTICE COTHRAN (dissenting) : I very earnestly favor a rehearing in this case for the following reasons in addition to those urged in my dissenting opinion and in the exceedingly forcible views presented in the petition which should be reported:

The Court, having affirmed the decree of the circuit Judge for the reasons stated by him, has committed itself not only

to an affirmance of the decree, but to the annunciation of a principle which I regard as erroneous and fraught with incalculable harm and confusion—that an attorney of record, especially in an equity case, has both actual and implied authority to purchase for his client, without instruction, property offered for sale in a case to which such client is a party.

In an experience of 42 years at the bar I have never known such a principle to be acted upon or even suggested, and do not believe now, notwithstanding this decision, that any reputable lawyer in the state would assume such responsibility, particularly where he has failed to notify his client of the sale, and has created upon his mind the impression that it would not be necessary for the client to bid upon the property, as appears in this case.

In the case of *Savery v. Sypher,* 6 Wall., 157; 18 L. Ed., 822 (Supreme Court of the United States), the administratrix of the mortgagee brought foreclosure proceedings against the mortgagor, a proceeding as here in equity. At the sale of which the mortgagee had notice, the attorney for the mortgagee bid off the property at a certain price and had it charged to his client. The mortgagor insisted upon the mortgagee complying with the bid which her attorney had made. The Court declined to confirm the sale, saying:

"The burden of proof was imposed on * * * [the mortgagor] who seeks to confirm the sale, to show the authority of * * * [the attorney]; for an attorney, *virtute officii,* has no authority to purchase property in the name of his client."

In *Bauman v. Eschallier,* 184 F., 710; 107 C. C. A., 44, another case in equity, the mortgagee placed the mortgage in the hands of an attorney for foreclosure; judgment was obtained and at the foreclosure sale the attorney, without instructions, bid off the property and had it charged to the

mortgagee. Upon the question whether the mortgagee was bound by the act of the attorney, the Court said:

"We find nothing in the record to support such a conclusion [that the attorney acted as the agent of the mortgagee in bidding off the property]. McQuaide [the attorney] was her agent to foreclose the mortgage and have the mortgaged property sold by the sheriff; but he was not authorized to bid for Mrs. Bauman [the mortgagee] at the sheriff's sale. His relation to Mrs. Bauman was that of attorney to client. While an attorney has large discretionary powers in the conduct of a suit, he has no power, by virtue of his mere authority to conduct a suit and collect the judgment, to purchase property for his client, and thereby substitute such property for the money."

In *Beardsley v. Root,* 11 Johns. (N. Y.), 464; 6 Am. Dec., 386, the syllabus is as follows:

"An attorney, by his general authority as such, cannot purchase land sold under execution in favor of his client, either in trust or for the benefit of such client."

The Court very aptly says:

"To permit an attorney, in this way, to make his client his debtor, might frequently lead to the most injurious consequences. Many clients, instead of recovering and receiving their money according to the ordinary course of proceeding, would unexpectedly find themselves involved in intricate and extravagant speculations, to the management of which they might be totally incompetent, and which in the end might prove ruinous."

It appears in the case at bar that the Murchison Bank had collateral which to a considerable extent protected them, and naturally, located in another state, in the banking, not real estate business, they would not have authorized the purchase at the full price of both mortgages, which is admitted to have been more than could have been realized except after long holding.

In *Treasurers v. M'Dowell,* 1 Hill (S. C.), 184; 26 Am. Dec., 166, it is said:

"The authority of an attorney, * * * is confined to the conduct and management of his client's cause, in which his skill and learning only is put in requisition."

In *Le Conte v. Irwin,* 19 S. C., 554, it was held that the attorney for the plaintiff had the right at foreclosure sale to purchase the property for himself. The Court says:

"We do not see why the attorney of the plaintiff, * * * may not be a *bona fide* bidder at a judicial sale fairly conducted, as well as any other person. He has no duty to perform that is inconsistent with the character of purchaser."

From these authorities and upon principle I think it is clear that Gasque as attorney for the Murchison Bank had no implied authority arising from that relation, to bind the bank to his bid.

It is equally clear that he had no express authority to do so, and does not claim that he had. The plain unvarnished facts of the case are that he had received no instructions from the bank to bid any amount at the sale; that the bank, having collateral sufficient to protect them, was not interested at all in making the property bring the amount of both mortgages; that the bank was not notified of the sale; that the bank was left under the impression by Gasque that Lide would run the property up to a figure that would protect both mortgages senior to Lide's claim.

The effect of the decision is to saddle the bank with the ownership of a piece of property which it did not want and authorized no one to buy for them. Of course in complying with their bid the bank must pay in the amount of the national bank mortgage, $2,250 with interest and attorney's fees and receipt for the amount of its mortgage $3,347 and interest, although it holds other Collateral sufficient to protect a substantial part of its debt. All of

this collateral will be lost to the bank as soon as it receipts for the amount of its mortgage.

But assume for the sake of argument that Gasque had express or implied authority to bid for the bank at the sale, in protection of its interest, I think that his action in running the property up to $6,500 was so improvident as to render the bank not responsible therefor. He was advised that the bank held other collateral. He did not inform himself as to its value and the consequent interest which the bank may have had in running up the property. Certainly that interest did not require the property to bring the full amount of both mortgages. He concedes that his bid of $6,500 was more than could be realized out of the property except it be held for a considerable time in the uncertain hope of better times for real estate.