608 F.2d 973
 W. N. MILLER, Jr. and T. W. Miller, Appellees,
v.
PREMIER CORPORATION, Appellant,
and
W. L. Brittain, Robert M. Bohnel, C. Gerald Haarer, Darold
F. McCalla, D. V. M., Percy L. Alverson, Edward J.
Scheider, and James Ferguson, Defendants.
W. N. MILLER, Jr. and T. W. Miller, Appellants,
v.
PREMIER CORPORATION and National Agricultural Finance
Company, Appellees,
and
W. L. Brittain, Robert M. Bohlen, C. Gerald Haarer, Darold
F. McCalla, D. V. M., Percy L. Alverson, Edward J.
Scheider, and James Ferguson, Defendants.
 Nos. 77-2542, 77-2543.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 4, 1978.
Decided Oct. 5, 1979.
 
 David L. Freeman, Greenville, S. C. (William W. Kehl, Wyche, Burgess, Freeman & Parham, P. A., Greenville, S. C., Charles W. Borgsdorf, Hooper, Hathaway, Fichera, Price & Davis, Ann Arbor, Mich., on brief), for appellant.
 O. G. Calhoun, Jr., Greenville, S. C. (Jesse C. Belcher, Jr., Greenville, S. C., on brief), for appellees.
 Before BRYAN, Senior Circuit Judge, and BUTZNER and PHILLIPS, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 These consolidated cases grew out of ill-starred tax shelter investment ventures by two brothers, W. N. Miller, Jr. and T. W. Miller (Millers). When their investment in cattle breeder and feeder operations went bad, each investor sued various corporate managers and financiers of the ventures along with some of their corporate officers for violations of securities and usury laws and for common law fraud. The principal defendant, Premier Corporation (Premier), counterclaimed against each of the Millers for sums allegedly due on promissory notes and management contracts. A jury found for the Millers on their common law fraud claims and against Premier on its counterclaims, and the court sitting without a jury on the usury claims found for the Millers on one and against them on the other. We affirm as to the common law fraud claim; remand for new trial on the counterclaim; affirm denial of the one usury claim; and reverse the award made on the other.
 
 I. BACKGROUND
 
 2
 Having realized a substantial gain from the sale in 1972 of a family business, the Millers looked for an investment to defer some of their tax liability and were referred by their attorney to one Carleton B. Foster, a securities broker. Foster was employed by a brokerage firm, Financial Analysts, Inc. (FAI). FAI was at the time a nonexclusive agent for the defendant Premier, a Michigan corporation engaged in the management of breeding cattle operations for outside investors and, through subsidiaries including the defendant National Agricultural Finance Co. (NAFC), the management of cattle feeding operations for outside investors. Premier supplied FAI with copies of its prospectus for cattle breeding investments, and with copies of a pro forma statement of projected expense outlays, cattle sales income, tax savings, and net profit that could be adapted to an hypothesized cattle breeding investment. Premier had specifically instructed FAI not to provide copies of the pro forma statement to investors and not to give any information or make any representations not included in the prospectus.
 
 
 3
 Foster nevertheless gave to the Millers and used in conferences with them copies of the pro forma statement that were adapted to their particular situation by using personal financial information obtained from the Millers' accountant. According to testimony by the Millers, Foster fleshed this out with oral representations respecting such specific profit factors as the calving rate that was expectable and the sale rate that would be realized in respect of high value animals and came up on the basis of these and other factors with specific profit and tax saving projections. These included a projected net profit for each of more than $200,000 over a five-year period. According to the Millers, Foster assured them that Premier would "make these numbers work."
 
 
 4
 In October 1972, the Millers signed individual contracts for investment in Premier's cattle breeding program in the amount of $180,000 each, making a downpayment of ten percent and giving installment notes for the balance of $162,000. Although the contracts that each signed contained specific acknowledgments that the signer had received Premier's prospectus that gave clear warnings on its first page that cattle investment involved high risks and that a price drop would yield probable losses and destroy tax benefits, the Millers testified on trial that they invested primarily because of Foster's oral and documentary representations.
 
 
 5
 Soon after this 1972 cattle breeder investment, Foster recommended that the Millers invest in cattle feedlot operations. At Foster's request, Premier prepared an investment plan for their consideration. After considering it, in December 1972, the Millers entered contracts for investment in Premier's feedlot operation for $176,000 and $318,576 respectively,[1] again making substantial downpayments and giving installment notes for balances due under the contract. The effective interest rate on these December 1972 notes was 8.5 percent.
 
 
 6
 In January, 1973, Foster instructed the Millers by letter to "ignore any apparent discrepancies" between the payment schedule in his pro forma statement and Premier's bills for their herd expenses, and sent a copy of this letter to Premier. Although this letter plainly revealed that Foster had used the pro forma financial statement in his dealings with the Millers, Premier took no action to warn the Millers against reliance upon it nor to disclaim Foster's action.
 
 
 7
 In November 1973, responding to a private placement memorandum respecting another feedlot operation to be managed as agent by Premier's subsidiary NAFC, the Millers executed contracts with NAFC for investments in this operation. Each made an initial investment of cash, and subsequently executed notes for purchases of grain for feeding out the cattle in which shares were owned.
 
 
 8
 With the Millers thus invested in the 1972 breeder operation and the 1972 feedlot operation with Premier, and in the 1973 feedlot operation with NAFC, the cattle market plummeted, reaching its nadir in January 1975. Losses were heavy in the cattle industry generally and specifically in the operations involved here. Plaintiffs of course adduced evidence that among the factors contributing to their own losses were the now-revealed falsity of various ones of the profit factors represented to and relied upon by them. With respect to each of the investments operations steps were taken to cut the Millers' losses. With respect to the 1972 breeder operation, the Millers exercised a buy-back option in May 1975 and sold numerous animals to Premier. Premier lost large sums in fulfilling this option, in repurchasing some steers, and in replacing dead and cull cattle among the Millers' herds. To counter the market drop for the 1972 feedlot investment, Premier completely liquidated the Millers' interests and returned to them their invested funds, including both principal and interest on the December 1972 notes, plus a small profit. To minimize losses on the 1973 feedlot operation, NAFC sold off some of the Millers' grain. On their side, after paying in considerably less than the full amounts due on their respective obligations on the notes given incident to the 1972 breeder cattle investment with Premier, the Millers ceased paying installments when due, leaving substantial amounts owing by each under terms of those notes.
 
 
 9
 In this state of affairs, the Millers in March of 1977 commenced separate diversity actions against Premier, NAFC, and a number of directors and officers of the two corporate defendants. In original, then amended, complaints each asserted claims against all these defendants under the South Carolina and federal securities laws; against Premier for common law fraud; and against Premier and NAFC for violations of the usury laws. The securities law claims alleged, in general, misrepresentations or omissions of required disclosures in the investment documents. The common law fraud claim alleged misrepresentations of material facts inducing the investments and fraudulent breaches of fiduciary duties. One of the usury claims was against Premier only and related to interest charges on the notes executed in respect of the 1972 feeder investment with Premier; the other was against Premier and NAFC and related to interest charges in respect of the 1973 feeder investment. Premier counterclaimed for balances due on the 1972 breeder investment promissory notes and management contracts, and for the value of materials supplied and services rendered in connection with that investment.
 
 
 10
 The cases were consolidated for trial and the parties agreed that the usury claims should be determined by the court following jury trial of the other issues. The jury found Premier liable to the Millers on the common law fraud claim, awarding damages of $50,000 to each; no liability against any defendants on the securities law claims;[2] and no liability on Premier's counterclaim. The district court then determined that Premier was liable on the usury claim related to the 1972 feeder investment; but that neither corporate defendant was liable on the usury claim related to the 1973 feeder investment.
 
 
 11
 Premier then moved for judgment n. o. v. in respect of the common law fraud and counterclaim verdicts; but did not move additionally or in the alternative for new trials in respect of either. See Fed.R.Civ.P. 50(b). The district judge denied the motions.
 
 
 12
 Premier's appeal and the Millers' cross-appeals assign errors only in respect of Premier's liability on the fraud claim, the denial of Premier's counterclaim, and the allowance of one and denial of the other usury claim. The securities law claims are thus not involved. We take the claims involved on this appeal in order.
 
 II. COMMON LAW FRAUD
 
 13
 Premier's appeal challenges the legal sufficiency of the evidence for submission to the jury on these claims.[3] The common law fraud claims actually involved allegations both of material misrepresentations inducing the several investments[4] and subsequent fraudulent non-disclosures of material facts by Premier while acting in a fiduciary capacity. Both theories were submitted to the jury as possible bases for finding liability. Although we think the second theory extremely dubious in law and fact,[5] we need not discuss it further because we conclude that there was sufficient evidence for submission to the jury on the theory of misrepresentation.
 
 
 14
 In the first place there was evidence sufficient to bind Premier for the representations made by its undoubted agent Foster. A disclosed principal, as was Premier, may be responsible for unauthorized as well as authorized representations of its agent if they are made incidental to an authorized contract and if the making of representations concerning the contract do lie within the authority of the agent. Restatement (Second) of Agency § 162 (1958). This rule is however subject to the qualification that the other party, here the Millers, shall not have been on notice that the representations were untrue or unauthorized, Id. Here the evidence, even when viewed in the light most favorable to the Millers, pointed strongly to their knowledge that Foster's oral and documentary representations involving profit projections were unauthorized when made. The disclaimer in both the prospectus and the pro forma statement flatly stated this and the Millers were on at least constructive notice of their contents. Had nothing else appeared, the evidence may not have been sufficient under this rule to bind Premier to Foster's unauthorized representations.
 
 
 15
 However, there was evidence from which the jury could have found Premier to have ratified any representations by Foster included in or explanatory of the pro forma statement. As indicated, in January 1973 Foster wrote the Millers a letter, with copy to Premier, respecting discrepancies between the payment schedule in the pro forma statement and the bills they were receiving from Premier in respect of the cattle herd expenses. There was evidence that Premier thereafter did nothing to warn the Millers or disclaim Foster's authority in respect of any representations that might be centered on the statement. "(U)pon being informed that its agent ha(s) gone beyond . . . his authority, it (is a principal's) duty within a reasonable time either to ratify or to disclaim the action of its agent." Foxworth v. Murchison National Bank, 136 S.C. 458, 469, 134 S.E. 428, 431 (1926); See Restatement (Second) of Agency, supra at § 82. Within this principle, debatable as may have been the issues of fact thereby raised, ratification of Foster's use of the pro forma statement and of oral representations centered upon it could have been found.[6]
 
 
 16
 Next, there was sufficient evidence from which the jury could have found the elements of common law fraud in Foster's representations. Those elements under South Carolina law are the traditional ones of common law fraud: misrepresentation of a material fact, made with knowledge of its falsity or ignorance of its truth, and intended by the maker to induce action in reliance; lack of knowledge by the other that the fact represented is false, reasonable reliance by the other upon the fact, and harm proximately caused by the reliance. See Jones v. Cooper, 234 S.C. 477, 482, 109 S.E.2d 5, 7 (1959); McKay v. Anheuser-Busch, Inc., 199 S.C. 335, 19 S.E.2d 457, 459 (1942). Serious questions are possible and are raised on this appeal in respect of the sufficiency of the evidence upon three of these elements: whether Foster's representations related to facts; whether the Millers actually relied upon them; and whether any reliance put upon them was reasonable.
 
 
 17
 To constitute fraud, a misrepresentation generally must relate to an existing or pre-existing fact, Moye v. Wilson Motors, Inc.,254 S.C. 471, 480, 176 S.E.2d 147, 152 (1970); Willard v. Chrysler Corp.,248 S.C. 42, 46, 148 S.E.2d 867, 868 (1954); an unspecific and false statement of opinion such as occurs in puffing generally cannot constitute fraud, Vulcan Metals Co. v. Simmons Manufacturing Co., 248 F. 853, 856 (2d Cir. 1918); W. Prosser, The Law of Torts § 109, at 726 (4th ed. 1971). Similarly, a false prediction or promise of future events generally cannot be a basis for fraud because it is not a representation, there is no right to rely on it, and it is not false when made, Holt v. Quaker State Oil Refining Co.,67 F.2d 170, 171 (4th Cir. 1933); Griffin v. Heinitsh, 309 F.Supp. 1028, 1033 (D.S.C.1970); Greer Bank & Trust Co. v. Waldrop, 155 S.C. 47, 53, 151 S.E. 920, 922 (1930). For this reason, misrepresentation of future profits, a type of opinion and prediction of future events, generally cannot constitute fraud. Steele v. Singletary, 120 S.C. 132, 138-39, 110 S.E. 833, 835 (1922). There are, however, exceptions to this general rule, and one has application to the evidence in this case. A false prediction concerning future events made by one with superior knowledge of those events may constitute a fraudulent misrepresentation. Lawson v. Citizens & Southern National Bank,259 S.C. 477, 485, 193 S.E.2d 124, 128 (1972); See Ruberg v. Brown, 50 S.C. 397, 401, 27 S.E. 873, 874 (1897); W. Prosser, Supra § 109, at 728 & n. 82.
 
 
 18
 The evidence going to the nature of Foster's representations about profit factors and anticipated profits[7] was, inevitably, hopelessly conflicting at trial, and the inferences rationally possible from it were at trial and here hotly contested by the parties. Premier would characterize any representations made as mere puffing, or as conditional and hypothetical assumptions, necessarily so understood by the Millers, hence not even amounting to predictions of future events. The Millers of course would characterize them as flat factual assertions about future events, of a sort susceptible to scientific and technical prediction by people with the kind of special knowledge of the cattle business reasonably attributable to Premier and hence to its agent. The evidence of superior knowledge on the part of Premier was equally conflicting, both in respect of basic facts and of inferences properly to be drawn from those facts. The resulting problems of credibility and probative force and of inferences to be drawn were of course for the jury. Our inquiry on the motion for judgment n. o. v. is simply whether the evidence was sufficient to permit a jury rationally to find for the Millers on this element of their claim.[8] We conclude that although the question is close, the evidence was sufficient within these principles for submission to the jury.
 
 
 19
 Sufficiency of the evidence to show reasonable reliance by the Millers poses an equally close question. It is of course intertwined with the question of Premier's superior knowledge in respect of the facts represented. Premier emphasizes that the Millers were intelligent, successful businessmen who were professionally advised throughout, and who must be taken to have understood the risks not only from their own experience but from the express statement of those risks in investment documents of whose contents they should be charged with notice. Quoting Ferland v. Orange Groves of Florida, Inc., 377 F.Supp. 690, 705 (M.D.Fla.1974), Premier argues that "given the nature of the investment and its dependence on weather and other risks of nature, an average prudent investor would recognize any guarantee of profits as a manifest impossibility." Brief of Appellant at 28. So too, says Premier, average prudent investors such as the Millers must be taken to know that any "guarantees" of profit here were manifestly impossible in view of the obvious risks of the market place. To the extent those risks were expressly stated in documents used in the transactions and signed by the Millers, says Premier, the Millers cannot claim misrepresentations at variance with the statements, citing Gordon v. Fidelity & Casualty Co., 238 S.C. 438, 446-47, 120 S.E.2d 509, 513 (1961). But the Millers of course need not show, nor are they claiming, that the representations had the character of an enforceable guarantee or warranty, nor even that they were presented as such. Rather they claim that within the principles of common law fraud they were misrepresentations of material facts made with at least reckless disregard of their possible falsity by a person upon whose superior knowledge of the particular facts they were entitled to rely. Manifestly unable to deny knowledge of general risks of the market place, they assert now as on trial that within that general knowledge they nevertheless reasonably relied upon special representations not totally at odds with those known risks. While their reliance and its reasonableness may seem a matter of considerable doubt on the record we read, we cannot say that they are as a matter of law so incredible that they could not rationally have been found by a jury from the evidence presented. These issues of reliance and its reasonableness, going as they do to subjective states of mind and applications of objective standards of reasonableness, are preeminently factual issues for the trier of fact. We conclude that on the evidence they were properly submitted to the jury.
 
 III. PREMIER'S COUNTERCLAIM
 
 20
 As indicated, the Millers ceased payment on their promissory notes given in connection with the original 1972 cattle breeder investment, leaving substantial balances unpaid. Premier counterclaimed against each to recover those balances and, in addition, amounts claimed to be owing for materials and services provided under the accompanying management contract.
 
 
 21
 The district court submitted the counterclaims to the jury over plaintiffs' motions for directed verdict.[9] In submitting the counterclaim the court gave instructions tied to the forms of verdict being employed that constitute reversible error requiring reversal of this portion of the judgment and remand for a new trial on the counterclaim.
 
 
 22
 In an effort to aid the jury in its resolution of the many issues presented in this multi-claim, multi-party action, the district court decided to give the jury a choice of four alternative general verdict forms to return.[10] Only one was to be returned and the court's instructions were designed to present the issues in a way related to the different verdicts so that the one proper choice would be dictated by the jury's resolution of the issues. One verdict was to be returned if the jury found for the plaintiffs on the securities fraud claims. Another was to be returned if the jury found for the plaintiffs against Premier on the common law fraud claim. A third was to be returned if the jury found for the defendant Premier on its counterclaim. The fourth was to be returned if the jury found against plaintiffs on all their claims, and against defendant Premier on its counterclaim (a general "for the defendant" verdict).
 
 
 23
 The validity of this practice of course depends upon whether under the substantive principles in play the four choices given were mutually exclusive. The district judge considered that they were, and instructed accordingly. In this there was error, because Premier's right to recover on its counterclaim was not substantively dependent upon its non-liability in respect of the securities and common law fraud claims.[11] This follows from the principle that a party to contract who sues to recover damages for fraud in its inducement rather than seeking rescission has thereby affirmed the contract and consequently assumed liability for its breach. See, e. g., Turner v. Carey, 227 S.C. 298, 87 S.E.2d 871 (1955). Under that principle of course it was perfectly possible for Premier to be entitled to recover on its contract claim despite being liable for damages for fraud in its inducement. The instruction effectively deprived Premier of that possibility.
 
 
 24
 On this appeal plaintiffs contend that Premier is precluded from challenging this instruction by failure to object in timely fashion to its giving. See Fed.R.Civ.P. 51. Again, we find the record hopelessly ambiguous on the matter. Plaintiffs point to a colloquy in which the judge invited suggestions for further instructions and was told by Premier's counsel that objection would be confined to "poking" at some of those given at plaintiffs' request. Defendant would explain that away by pointing to its earlier submission to the clerk of two instructions not given by the court that would have avoided this error. The instructions are set out in the defendant's brief, but we do not find them in the certified record as part of formal filings. They do indeed have the effect claimed for them by defendant, and their rejection by the district judge if formally submitted to the court would confirm the error we find. Plaintiffs on this appeal have not challenged the fact of their submission as asserted by defendant, and we would be disposed on that basis to assume the fact asserted. In any event, were it to be the case that they were not formally submitted, although the power should be exercised with great care we would find the instruction to involve plain error justifying consideration here despite failure to object as required by Rule 51. See Edwards v. Mayes, 385 F.2d 369, 373 n.1 (4th Cir. 1967). In this case the instruction plainly misstated fundamentally controlling substantive principles governing Premier's right to recover on its counterclaims.IV. USURY
 
 
 25
 As indicated, the district court sitting without a jury found the 1972 feedlot agreement notes given to Premier to be usurious, and awarded penalty and forfeiture damages but denied the Millers' usury claims against Premier and NAFC in respect of the 1973 feedlot agreement notes. These 1973 notes were given to a subsidiary of Premier not named as a defendant, and Premier was found not liable on the basis of factual findings from which it was concluded that the separate corporate identities should not be disregarded. These findings were not clearly erroneous, and the district court properly applied to them the principles respecting disregard of corporate identities set out in DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 685-87 (4th Cir. 1976). We therefore affirm that portion of the judgment without further discussion and turn to the usury award made with respect to the 1972 feedlot agreement and its accompanying promissory notes.
 
 
 26
 The 1972 feedlot agreement and accompanying promissory notes were made and payable in Michigan. The 8.5 percent interest rate provided in the notes was in excess of the then legal rates of interest under the law of both Michigan, Mich.Comp.Laws § 438.31 (1978) (7%), and South Carolina, S.C.Code § 8-3 (1962) (6%).[12] On the basis of these facts the district court rightly concluded that Michigan law controlled as to the "right" asserted in the Millers' usury claims. Under then applicable Michigan law a borrower charged interest over the legal rate might decline to pay it and might have its collection enjoined; but once the borrower paid the interest, Michigan law gave him no right to forfeiture or penalty against the lender. Mich.Comp.Laws § 438.32 (1978); Sienkiewicz v. Leonard Mortgage Co., 59 Mich.App. 154, 229 N.W.2d 352 (1975); Michigan Mobile Homeowners Association v. Bank of the Commonwealth, 56 Mich.App. 206, 223 N.W.2d 725 (1975). Under South Carolina law, on the other hand, a borrower who was charged and who paid interest over the legal rate had a right to the lender's forfeiture of any claim to unpaid interest plus a penalty award of double the amount of interest actually paid. Compare S.C.Code § 34-31-50 (1976) With Atlantic Discount Corp. v. Driskell, 239 S.C. 500, 505, 123 S.E.2d 832, 834 (1962). Relying on two South Carolina cases from the turn of this century, Carpenter v. Lewis, 60 S.C. 23, 38 S.E. 244 (1901), and Meares v. Finlayson, 55 S.C. 105, 32 S.E. 986 (1898), the district court concluded that the South Carolina choice of law rule dictated awarding the forfeiture and penalty remedy that South Carolina law provided. Thus the district court looked to Michigan law only to ascertain that it provided a lower legal rate of interest than that charged, but did not look beyond that to the legal consequences of such an excessive charge, to the entitlement that this created for the borrower. In consequence, the court awarded each claimant an amount computed under South Carolina law at three times the amount of interest charged, totals of $26,268 and $35,010 respectively.[13]
 
 
 27
 We conclude that the district court erred in its determination that South Carolina's current choice of law rule would dictate such a result. We hold instead that Michigan law would control and would dictate that plaintiffs had no right to any penalty or forfeiture, having voluntarily paid the interest charged.
 
 
 28
 Federal courts in diversity cases apply the choice of law rule of the state in which they sit. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Accordingly, South Carolina's choice of law rule controls here. That rule for usury cases with multi-state connections was apparently last applied authoritatively by the Supreme Court of South Carolina in Carpenter and Meares in 1901 and 1898 respectively. While the venerability of a rule coupled with long lack of opportunity to apply it certainly does not Per se draw its continued viability in question, neither does it compel any assumption that because not reexamined in the interval its continued applicability is presumptively established. The task of a court seeking to determine present applicability after so long an hiatus is more difficult. Particularly where, as here, the only applications have been isolated incidents, See Fahs v. Martin, 224 F.2d 387, 398 (5th Cir. 1955), and where these antedate the more systematic elaboration of conflict of law doctrine in recent years, See Clark, State Law in the Federal Courts: The Brooding Omnipresence of Erie v. Tompkins, 55 Yale L.J. 267, 292-93 (1946), a searching court is entitled to doubt continued viability if the general course of development during the interval has been against the isolated precedents.
 
 
 29
 We think that intervening developments in the law of personal jurisdiction and in choice-of-law doctrine itself make it at least doubtful that the rule of Carpenter and Meares would now be applied even to the special facts of those eighty year old precedents. More critically, we believe that under the influence of those intervening developments, and perhaps simply because of critical distinction between the facts of those cases and the instant one without regard to any intervening developments, the Carpenter/Meares rule would not be applied to afford any monetary relief to plaintiffs here.
 
 
 30
 First, the critical factual and legal distinctions between Carpenter/Meares and the instant case must be emphasized. In both the older cases a nonresident of South Carolina as plaintiff-lender had invoked the jurisdiction of a South Carolina court to collect a debt owed by a South Carolina borrower.[14] Usury was raised by the local borrower as a partial defense to that action. Foreign law was conceded to control on the question of the right to have any remedy for the interest charged. When South Carolina looked to that foreign law it found two critical elements defining the "rights" of lender and borrower: the interest charged exceeded the legal rate, and this entitled the borrower to a forfeiture and penalty remedy. This left for ascertainment only the proper amount of penalty and forfeiture damages to be set off against the lender's claim. The law of the foreign state was in each case more lenient to the lender than was South Carolina law.[15] Drawing on the general principle that the Lex fori controls the "remedy," the South Carolina court held that the amount of penalty and forfeiture to be set off was that provided by South Carolina law. In the instant case, by contrast, the action originated with a local borrower suing a nonresident lender in respect of a debt contracted in a foreign state under whose law the borrower would be entitled to No Remedy on the facts subsisting at the time the action was instituted.
 
 
 31
 It is important to recall that when the Carpenter/Meares choice of law rule was announced, jurisdictional law practically assured that a borrower subjected to usurious interest charges in one state could not effectively forum-shop for another state's more favorable usury "remedy" as defined by South Carolina.[16] Today, except as constrained by door-closing or Forum non conveniens considerations, the possibilities created for this by long-arm jurisdictional developments, particularly in respect of national corporate lenders, are quite real.[17] While the Carpenter/Meares rule was announced in cases where the "remedy" was being invoked defensively by local borrowers, in terms it applies as well to independent claims made by any borrower able to invoke the jurisdiction of the South Carolina courts. Indeed, this is the way plaintiffs seek to have it applied in this case. It seems likely that when the rule was announced in 1898 its purely offensive application was simply not contemplated,[18] and it is certain that the implications of present jurisdictional doctrine for such use could not have been.
 
 
 32
 Also critical are general developments in conflict of laws doctrine itself. Here the trend has been toward broad based identification of the state having the most significant relationship with the transaction in question as the proper source of applicable law. See Restatement (Second) of Conflict of Laws § 6, Comment C (1971). This approach minimizes many of the forum-favoring choice factors traditionally used in earlier times, including that of giving expansive readings to the scope of the forum's remedial law.
 
 
 33
 Under that approach it seems clear that Michigan law would be controlling here to deny any penalty and forfeiture relief to plaintiffs. The promissory notes in question were made and payable in Michigan, See Restatement (Second) of Conflict of Laws, supra § 188(3), and Michigan law provided the most lenient sanctions for charging an interest rate that exceeded the legal rate in both states, See id. § 203, Comments B and D.[19] We believe it highly likely that the South Carolina courts might now follow this approach, even though it would involve a fundamental reexamination of the Carpenter/Meares rule as literally formulated.
 
 
 34
 Even were the Carpenter/Meares rule still given general application as originally formulated, we do not believe that South Carolina courts would apply it to give relief by way of penalty or forfeiture to the plaintiffs here. As indicated above, the Carpenter/Meares rule emerged from fact situations in which both South Carolina and the state where the loan was made gave Some remedy by way of penalty and forfeiture to the borrower. In deferring to the law of the other state to define the parties' "rights," South Carolina could therefore have read the borrower's right as extending to that particular form of entitlement though not to its exact measure. Awarding the specific amount of penalty and forfeiture provided by South Carolina's "remedial" law was thus grounded in a substantive entitlement to the general form of remedy under the law of the other state. In the instant case, by contrast, under the law of Michigan no general entitlement, no substantive "right" to the recovery of any monetary relief in the nature of penalty and forfeiture, existed in the borrower. We think this defines the extent of the Millers' substantive right as properly determined by Michigan law.
 
 
 35
 Concluding that on either or both of these grounds the South Carolina choice of law rule would not dictate any award of penalty and forfeiture to plaintiffs, we reverse that portion of the judgment.
 
 
 36
 AFFIRMED IN PART; REVERSED IN PART; REMANDED FOR NEW TRIAL IN PART.
 
 BRYAN, Senior Circuit Judge, dissenting:
 
 37
 Not for a moment unmindful of the reasoned force of the majority opinion, I ask leave to dissent from its affirmance of the jury's verdict for the Millers (plaintiffs) on the "common law fraud claim."
 
 
 38
 The action is more accurately characterized, and more appropriately should be pursued, as a suit for an accounting in equity rather than as a common law fraud or other tort action. It arose out of the relationship of trust and confidence existing between the Millers and Premier (defendant). Considering additionally the sheer complexity of the issues, I think it was error for the trial court to let the jury return a verdict thereon without having a master prepare, and submit to the jury, at the conclusion of the evidence, a statement of the account between the parties. This procedure could have been directed by the Court Sua sponte, for equity has jurisdiction to compel an accounting where the issues are complex, especially if fraud is also charged. Kirby v. Lake Shore & Michigan R. R., 120 U.S. 130, 134, 7 S.Ct. 430, 30 L.Ed. 569 (1887). Here, too, the added existence of a fiduciary relationship should banish any doubts of the appropriateness of turning to equity for an accounting and the appointment of a master.
 
 
 39
 The contracts between the plaintiffs and defendant were not simply those of bargain and sale; they were contracts of agency, with the Millers as principals, Premier the agent. The agreements impressed upon the agent exacting responsibility for the use of plaintiffs' funds in the acquisition, in the management, in the breeding, in the feeding and, finally, in the sale of cattle. The majority's faithful relation of the transactions between the parties and the testimony with regard to the extent of their dealings reveal at once that the accounts between them were too complicated for a jury to assimilate.
 
 
 40
 The necessity for an accounting to resolve such difficulties was addressed in Kirby, 120 U.S. at 134, 7 S.Ct. at 432:
 
 
 41
 The complicated nature of the accounts between the parties constitutes itself a sufficient ground for going into equity. It would have been difficult, if not impossible, for a jury to unravel the numerous transactions involved in the settlements between the parties, and reach a satisfactory conclusion as to the amount of drawbacks to which Alexander & Co. were entitled on each settlement. 1 Story Eq.Juris. § 451. Justice could not be done except by employing the methods of investigation peculiar to courts of equity. When to these considerations is added the charge against the defendants of actual concealed fraud, the right of the plaintiff to invoke the jurisdiction of equity cannot well be doubted.
 
 
 42
 Since Kirby, the Court has declared that a trial by jury, as guaranteed under the Seventh Amendment, is now preserved in an equity suit, such as that at hand, by reason of the trial court's power under Fed.R.Civ.P. 53(b) to appoint a master to aid the jury by stating an account. This entitlement embraces those instances where "the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them." Dairy Queen v. Wood, 369 U.S. 469, 478, 82 S.Ct. 894, 900, 8 L.Ed.2d 44 (1962). Therefore, in the present case, faced both with complicated issues arising from the problematic transactions and with a demand for a jury, the District Judge, in resolution, had simply to name a master to sit in the trial.
 
 
 43
 The advantages here of an accounting are at once perceivable. Indeed, without an accounting the calculation of damages is purely speculative, thus rendering the remedy at law inadequate. Had such procedure been employed, the General basis, if any, upon which the jury arrived at $100,000.00 as the amount to be assessed against the defendants for damages would have become more nearly comprehensible; certainly it is not now apparent. It must be remembered that fraud alone, absent a showing of proximately caused damages, is not an actionable injury. Hence, the quantum of damages should not be left exclusively to the jury's discretion, as is customarily done for such intangibles as pain and suffering. At the same time, an accounting would precisely fix the sums, if any, due the defendant, in principal or interest, on the promissory notes given by the plaintiffs to the defendant.
 
 
 44
 Finally, the accounting would tend to give an arithmetic exactness to the resolution of the case as a whole. Dividing and deciding it in two parts the notes and the fraud is an unacceptable, piecemeal approach to a single, unified controversy.
 
 
 45
 In summary, I would vacate the judgment on appeal and remand for a new trial. The remittitur would direct the appointment of a master to hear the evidence during its introduction before the jury, and, thereafter, to file a statement of the account between the parties. It would be subject to exceptions of law and fact filed by counsel, to be respectively decided by the Court and jury.
 
 
 46
 This dissent is tendered with deference to the recognized acumen of my associates.
 
 
 
 [1]
 Herein, all dollar amounts are given first for W. N. Miller, Jr. and then for T. W. Miller
 
 
 [2]
 This was reflected in the jury's failure to return the general verdict form that they were instructed to use only if they found for the Millers on the securities fraud claims. See Part III Infra
 
 
 [3]
 Plaintiffs argue that defendant has not properly preserved the question of the sufficiency of the evidence on the fraud claim, because of its failure to move for directed verdict with the degree of specificity required by Fed.R.Civ.P. 50(a) prior to moving for judgment n. o. v. under Fed.R.Civ.P. 50(b). On the record, the contention is a serious and bothersome one, and we have so treated it. The requirement of a proper directed verdict motion as foundation for a motion for judgment n. o. v. under Fed.R.Civ.P. 50(b) is not a mere technicality; it serves vitally important interests in the fair conduct of litigation. See Virginia-Carolina Tie & Wood Co. v. Dunbar, 106 F.2d 383, 385 (4th Cir. 1939). For this reason an appellate court should not hesitate to enforce it where the record shows a clear failure by counsel to observe it, no matter how meritorious may be the argument of the insufficiency of evidence presented on appeal. But here the record is simply not that clear. No written motions were filed. Oral motions for "dismissal" were made in a colloquy that is too confusing to permit confident assessment. Without exhaustive analysis here it suffices to say that taking into account the confusion caused by the interrelation of the securities law and common law fraud evidence and the entire course of the colloquy between court and counsel, we conclude that fairness requires consideration of Premier's contentions respecting sufficiency of the evidence
 
 
 [4]
 Though plaintiffs alleged misrepresentations inducing all these investments, we consider the evidence of misrepresentations properly chargeable to Premier to have related only to those alleged to have induced the original cattle breeder investment of 1972. The common law fraud claims were against Premier alone. The 1973 feedlot investment was with NAFC, not Premier, and although plaintiffs on this appeal apparently contend that the corporate veil should be pierced to reach Premier in respect of representations touching the 1973 investment, the evidence (as to which plaintiffs had the burden of persuasion) simply would not support such a theory. See DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681 (4th Cir. 1976). Aside from other deficiencies of proof, the 1972 feedlot investment was effectively washed out by Premier's voluntary return of principal, interest, and a small profit, so that the harm element itself was not supported in evidence
 
 
 [5]
 This theory, clearly established and still evolving in general tort law, See W. Prosser, The Law of Torts § 106, at 695-96 (4th ed. 1971), has been applied mainly in seller-purchaser transactions, substantially confined to nondisclosures by sellers intended to induce sales and investments in the first place. In Holly Hill Lumber Co. v. McCoy, 201 S.C. 427, 23 S.E.2d 372 (1942), cited and relied upon by plaintiffs, the South Carolina Supreme Court recognized the doctrine's existence in South Carolina law, but held it inapplicable to an instance of purchaser nondisclosure. The nondisclosures relied upon in the instant case had to do with facts pertaining to Premier's activities in managing the Miller's investments after the various investments had already been made, and the confidential relationship asserted was that of principal and agent created by the management contracts. Whether South Carolina law would apply nondisclosure doctrine in that general situation, and whether, if so, the facts would justify its application in this particular case are matters on which no specific authority has been brought to our attention. The district judge considered it doubtful enough to warn plaintiffs' counsel of the possible danger in submitting the theory, though he proceeded to do so. We expressly avoid addressing these questions of state law in view of their uncertain state and our affirmance of the fraud claim verdicts on other grounds
 
 
 [6]
 Actually, there was some evidence that Premier, through its officer McCalla, more directly ratified Foster's use of the pro forma statements in selling the Millers. The Millers testified that Foster told them that Premier would "make the numbers (in the pro forma projection) work"; and Foster testified that when he reported to McCalla having made this representation, McCalla said that in that case he, McCalla, should see the numbers. From this a direct ratification might be inferable since communication is not required. Restatement (Second) of Agency § 92(q)
 
 
 [7]
 We accept defendant's argument that among a wide range of misrepresentations and omissions to disclose alleged by plaintiffs, only those going to factors, such as expectable calving rates, directly tied to the ultimate predictions of specific profits may properly be considered material facts within the common law fraud claim asserted. Our assessment of the evidence has been confined to these
 
 
 [8]
 This is a question of law, identical to the question presented to the district court. See 9 C. Wright & A. Miller, Federal Practice & Procedure, Civil § 2524 (1971). The quite different question whether this verdict is against the weight of the evidence, See Garrison v. United States, 62 F.2d 41, 42 (4th Cir. 1932) (Parker, J.), is not presented on this appeal. See 9 C. Wright & A. Miller, Supra at § 2531. Neither is there presented any question of the possible excessiveness of the damages awarded as opposed to the sufficiency of evidence of some degree of compensable harm. Premier's arguments directed to the lack of evidentiary support for the specific amounts awarded in each case are therefore not relevant to the question raised by its motion for judgment n. o. v
 
 
 [9]
 The plaintiffs defended against the counterclaims with denials of essential allegations of damage, and with affirmative defenses based upon Premier's alleged violations of state securities laws. On this motion for directed verdict, the district court ruled against the affirmative defenses as a matter of law. The plaintiffs do not challenge that ruling on this appeal and we do not therefore address it. Premier also moved for judgment n. o. v. in respect of the counterclaim verdict. Again, serious questions are raised with respect to its foundation in a prior directed verdict motion. Because the parties were clearly at issue as to amounts owing on the counterclaim, we need not consider the procedural question
 
 
 [10]
 This was not the special verdict submission authorized by Fed.R.Civ.P. 49(a), but a general verdict submission in which various discrete general verdict choices were given as alternatives. As the ensuing discussion in this opinion indicates, that is a perfectly serviceable practice so long as the substantive law justifies it. But its dangers are obvious
 
 
 [11]
 In submitting the counterclaim verdict form, the judge instructed the jury: "If you find that the plaintiffs haven't satisfied you by the preponderance or greater weight of the evidence that the plaintiffs are entitled to recover . . . then you would . . . go to the third form of verdict . . . and you would say if you are satisfied that the counterclaim has been proven . . . . 'We the jury, unanimously find for the defendants (Sic ) on its counterclaim' . . . so many dollars actual or compensatory damages to make the defendants (Sic ) whole from what they suffered by virtue of the Plaintiffs' actions in this particular case."
 There is no possibility, looking to the instruction as a whole, that the counterclaim and fraud claim verdicts were effectively made substantively compatible by allowing for consideration of set-off possibilities in arriving at one or the other. Plaintiffs' suggestion to the contrary on this appeal, Brief of Appellees at 27, simply will not hold up. The conclusion is inescapable that the jury must have considered that it could find for Premier on the counterclaims only if it had found against the plaintiffs on all their claims.
 
 
 [12]
 The South Carolina statute was amended in 1973 substantially revising the legal rates of interest. Under the amended law, the 8.5 percent interest charges here involved would apparently be within the legal rate. See S.C.Code § 34-31-30 (1976)
 
 
 [13]
 Premier raises a serious challenge to the amounts of these awards even if South Carolina law is correctly applied, contending that the awards fail to take into account the undisputed fact that Premier in settling out the 1972 feedlot investment had already returned the Millers' entire investment, including interest paid, plus a small profit. Therefore, says Premier, the forfeiture portion of the usury award had already been realized. In view of our disposition of the appeal, we need not address that contention
 
 
 [14]
 Both cases involved actions by receivers of defunct Building & Loan Associations of other states (Carpenter, Tennessee; Meares, North Carolina) to collect balances owing by South Carolina residents on notes given for the purchase price of Association shares. Each was secured by mortgages on South Carolina land, a special factor that may have had decided influence on the decisions to apply South Carolina "remedial" law
 
 
 [15]
 In Meares it clearly appears that North Carolina law provided for forfeiture only of interest paid in excess of the legal rate while South Carolina law provided for forfeiture of all interest paid. In Carpenter the specific provision of Tennessee law is not explored, but it must have been more lenient to the borrower, given the court's concern to apply a presumably different South Carolina rule
 
 
 [16]
 Acquiring personal jurisdiction in a particular forum would then have depended essentially upon the chance of defendant's physical presence. Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1878), was of course still in full sway
 
 
 [17]
 See, e. g., Smith v. Regina Mfg. Corp., 396 F.2d 826 (4th Cir. 1968) (applying South Carolina corporate long-arm statute)
 
 
 [18]
 Indeed the whole discussion of right and remedy in Carpenter was centered on those of the nonresident lender. That lender, seeking to enforce in South Carolina a contract right arising under foreign law was required to take his remedy as South Carolina law limited it. Those limits, although they actually derived from the borrower's substantive right under South Carolina's usury law, were converted into remedial limitations upon the lender's contract right under the Carpenter analysis. It simply does not appear how that analysis would have proceeded had the only right and remedy before the court been, as here, that of a resident borrower asserting as plaintiff a usury claim in respect of a loan contracted in another state
 
 
 [19]
 The rate charged was not so grossly excessive of either state's limits as to weigh heavily against the inclination of contemporary choice of law doctrine to apply that law best adapted to enforcement of the parties' expectations as expressed in their contracts. See Restatement (Second) of Conflict of Laws, supra § 203, at Comment B