**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOAN H. LEWIS,
<u>Plaintiff-Appellant,</u>

v.

TRUSTMARK INSURANCE COMPANY

No. 98-2493

(MUTUAL); CERTIFIED SYSTEMS,
INCORPORATED; ROPER PERSONNEL
SERVICE; ROPER STAFF LEASING,
INCORPORATED,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Dennis W. Shedd, District Judge.
(CA-96-1336-3-19)

Argued: May 4, 1999

Decided: July 12, 1999

Before WILKINSON, Chief Judge, and
WILKINS and LUTTIG, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert Edward Hoskins, FOSTER & FOSTER, Green-
ville, South Carolina, for Appellant. Timothy William Bouch,
LEATH, BOUCH & CRAWFORD, L.L.P., Charleston, South Caro-

lina; Franklin Grady Shuler, Jr., TURNER, PADGET, GRAHAM & LANEY, P.A., Columbia, South Carolina, for Appellees. **ON BRIEF:** L. Joel Chastain, Terry Edward Richardson, Jr., NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE, Barnwell, South Carolina, for Appellant. Anita M. Alessandra, William O. Ashcraft, ASHCRAFT LAW FIRM, Dallas, Texas, for Appellees Certified Systems, Roper Personnel, and Roper Leasing.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Joan Lewis was diagnosed with breast cancer and sought coverage under her health insurance plan for a course of treatment recommended by her physician. After consulting three outside physicians with expertise in the treatment of cancer, the administrator of the plan determined that the treatment was experimental and denied coverage. Lewis brought an ERISA suit challenging that denial, and the district court granted summary judgment to the defendants. Because we hold that the plan administrator did not abuse its discretion by finding the treatment experimental as that term is defined by the plan, we affirm.

I.

Joan Lewis is the owner and operator of a retail gift shop named Santee Shoppe, Ltd. in Columbia, South Carolina. Lewis claims that in 1994, she was approached by an agent of Roper Personnel Service and Roper Staff Leasing, Inc. (collectively Roper). The salesman proposed a contract whereby all Santee Shop employees would become employees of another company, Certified Systems, Inc. (CSI). CSI would handle all administrative responsibilities for the employees, including payroll tasks, human resource services, and employee insurance and benefits. The employees would then be leased back to San-

2

tee Shoppe. Lewis, on behalf of Santee Shoppe, entered into the contract with CSI. As a result, Lewis herself became an employee of CSI.

As part of its benefit package, CSI provides a Trustmark Insurance Company health insurance policy. Lewis became a member of the Trustmark plan effective February 1, 1995.

Prior to becoming a member of the Trustmark plan, Lewis was diagnosed with breast cancer. In 1989 she underwent a mastectomy and other treatment and the cancer went into remission. After she joined the Trustmark plan, however, the disease returned. In September 1995 Lewis was diagnosed with Stage IV metastatic breast cancer. Her treating physician, Dr. Henslee-Downey, recommended she undergo high dose chemotherapy supported by peripheral stem cell rescue (HDC/PSCR). Lewis then submitted to Trustmark a pre-treatment authorization request for HDC/PSCR treatments.

Trustmark's Medical Director referred Lewis' request to an outside medical review board. The board consisted of three oncologists selected by the Medical Ombudsman Program, an independent company. Based on their opinions the plan administrator determined that Lewis' treatment was, under the terms of the plan, medically unnecessary, investigational, and experimental. Trustmark denied coverage for HDC/PSCR in February 1996.

Lewis appealed Trustmark's denial of benefits and submitted medical literature and affidavits supporting her position. 29 U.S.C. § 1133. Trustmark reaffirmed its decision.

Lewis then filed suit against Trustmark, CSI, and Roper. Among other things, she alleged that Trustmark improperly denied coverage. 29 U.S.C. § 1132(a)(1)(B). She asserted that HDC/PSCR was medically necessary, not experimental, and thus covered by the plan. Lewis also claimed that under South Carolina law she was fraudulently induced into joining the insurance plan by representations that she would have full and comprehensive health benefits.

The district court granted summary judgment to the defendants. It found that the plan administrator did not abuse its discretion by find-

ing that Lewis' treatment was not covered by the Trustmark plan. The court also held that her fraudulent inducement claim was preempted by ERISA. Lewis appeals.

II.

The Trustmark plan delegates to the plan administrator "full, exclusive and discretionary authority to determine all questions arising in connection with the group contract including its interpretation." Trustmark Plan at 58. As such, we review the administrator's decision only for abuse of discretion. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989). A reviewing court will not disturb an administrator's reasonable interpretation and application of a plan provision. Fox v. Fox, 167 F.3d 880, 883 (4th Cir. 1999). Where, as here, the administrator has a financial interest in the outcome of its determination, "deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict" of interest. Doe v. Group Hospitalization & Med. Servs., 3 F.3d 80, 87 (4th Cir. 1993).

A.

Lewis initially argues that the plan's incontestability clause requires that the plan pay for her treatment. That clause states:

> TIME LIMIT ON CERTAIN DEFENSES -- FOR ALL BENEFITS OTHER THAN LIFE.
>
> After coverage has been in force during a person's lifetime for one year from his effective date only fraudulent misstatements in his application or enrollment form may be used to void his coverage or to deny any claim made by him for loss incurred starting after such one year period.

Trustmark Plan at 57. Lewis contends that because her treatment began on February 12, 1996 -- more than one year after coverage had been in force -- this clause bars the plan administrator from denying a claim for benefits for any reason other than fraudulent misstatements. Thus, under the plan Trustmark has no discretion to deny her claim for benefits.

4

We disagree. An incontestability clause may defeat an insurer's attempt to declare a person ineligible for coverage under the plan. Rapak v. Companion Life Ins. Co., 990 F.2d 801, 803-04 (4th Cir. 1993). But such a clause does not operate to define plan benefits or defeat exclusions from coverage. This is so even where the incontestability clause is written in broad and expansive terms. "An incontestability clause prevents an insurer from contesting the validity of an insurance contract. However, such a clause certainly does not prevent the insurer from invoking the plain terms of an ERISA plan." White v. Provident Life & Accident Ins. Co., 114 F.3d 26, 28-29 (4th Cir. 1997).

Thus, we hold that the incontestability clause at issue here does not force the plan administrator to pay any claim without limitation. This interpretation gives effect to the plain intent of the parties and gives meaning to the contract as a whole. Courts "should not torture the meaning of policy language in order to extend or defeat coverage that was never intended by the parties." Gambrell v. Travelers Ins. Co., 310 S.E.2d 814, 816 (S.C. 1983). To interpret the clause otherwise would substitute an unsupportable reading of the clause for a reasonable reading of the contract.

B.

Lewis also argues that the plan administrator abused its discretion by finding that the treatment was experimental. She asserts that HDC/PSCR was a generally accepted treatment for Stage IV breast cancer. She points to a South African study indicating HDC/PSCR's superiority to conventional standard dose treatment. And Lewis notes that her own treating physician, Dr. Henslee-Downey, stated "unequivocally that HDC/PSCR is a `generally accepted' alternative for the treatment of Stage IV breast cancer." Finally, Lewis cites our decision in Wilson v. Office of Civilian Health & Med. Programs of the Uniformed Servs., 65 F.3d 361 (4th Cir. 1995). In Wilson, this court noted that "HDC/PSCR is gaining widespread acceptance within the medical community" and the evidence suggests "a broad consensus of physicians recognize[s] [its] efficacy." Id. at 366 (internal quotation marks omitted). Thus, Lewis argues that HDC/PSCR

5

was not experimental and should have been covered by the Trustmark plan.**1**

A court's role is to examine the ruling of a plan administrator and decide whether that determination was a reasonable interpretation of the written terms of the plan. Here, we cannot conclude that the Trustmark administrator's interpretation was unreasonable. It may be, as Lewis contends, that many doctors did not consider HDC/PSCR to be experimental, as that term is generally used in the medical profession. But the written Trustmark benefit plan gives the term experimental a specific definition, which governs this case. The plan explicitly states "No benefits are paid for . . . Experimental treatment, including treatment with new drugs or technological medical devices which are Experimental in nature." Trustmark Plan at 12. The policy then defines experimental:

> A drug, device or medical treatment or procedure is Experimental . . . if Reliable Evidence shows that the drug, device or medical treatment or procedure is the <u>subject of ongoing Phase I, II, or III clinical trials</u> or under study to determine its maximum tolerated dose, its toxicity, its safety, its efficacy, or its efficacy as compared with the standard means of treatment or diagnosis . . . .

Trustmark Plan at 3 (emphasis added).

_____

**1** In addition, Lewis argues that the consistent enforcement of the plan's definition of experimental would deny coverage to many advanced medical procedures and that Trustmark cannot arbitrarily choose which procedures to cover and which not to cover. While this may be true, Lewis adduced no evidence demonstrating that Trustmark arbitrarily does cover some experimental treatments but not others.

Lewis also contends that Trustmark's own internal procedures dictate payment for HDC/PSCR for the treatment of stage IV breast cancer for beneficiaries in 10 states, but not for those in South Carolina. Trustmark, however, determined that state law in those states required this coverage, and the plan notes that the experimental treatment exclusion was "Subject to State Approval." Trustmark Plan at 12. Lewis has pointed to no evidence indicating that Trustmark has abused its discretion in attempting to comply with state law.

In order to evaluate whether HDC/PSCR was experimental under this definition, Trustmark turned to the Medical Ombudsman Program, an independent company. The Medical Ombudsman Program in turn referred the matter to a review board of three oncologists. Among the questions asked of the oncologists was"Are the drugs, therapies, or treatments proposed currently the subject of ongoing Phase I, Phase II, or Phase III clinical trials or otherwise under study to determine the maximum tolerated dose, toxicity, safety, efficacy, or efficacy as compared with standard[ ] treatments?"

In response to this and other questions, all three doctors indicated that HDC/PSCR was subject to ongoing Phase I, II or III clinical trials. Dr. Samuel M. Silver, Director of the Adult Bone Marrow Transplant Program at Comprehensive Cancer Center of the University of Michigan, stated that although he personally did not consider the treatment experimental, "[s]ince high-dose chemotherapy needs to undergo phase 3 studies in high priority National Cancer Institute protocols, the use of this therapy is investigational in that data is still being collected." When asked specifically whether the treatment was still in clinical trials, he stated, "YES. As mentioned, there are a number of phase 3 studies still ongoing and are high-priority National Cancer Institute approved comparing transplant to lower dose therapy. The fact that this patient is receiving Gamma Interferon and Cyclosporin makes this a phase 2 study which looks at the efficacy of these adjunctive immunologic drugs."

To the same question Dr. Robert K. Stuart of The Medical University of South Carolina responded, "Yes. The treatment, or at least some aspects of it [the use and dosages of certain drugs] are apparently in Phase I or Phase II clinical trials at the University of Colorado and/or the University of South Carolina."

Similarly, Dr. Robert Dreicer, Associate Professor of Medicine and Urology at the University of Iowa, responded, "Yes with caveats. As a larger issue there are several phase III trials including the NCI [National Cancer Institute] sponsored intergroup study ongoing comparing the outcomes of patients with metastatic disease treated with standard therapy versus high dose therapy with rescue. As is indicated in Dr. Henslee-Downey's note of 10/30/95 the high dose combination

7

proposed here was developed at the University of Colorado and may still be in phase II trials at that institution."

In sum, all three of the medical experts consulted by the Medical Ombudsman Program concluded that the HDC/PSCR treatment prescribed for Lewis was still in clinical trials. Their opinions were reinforced by a report by the National Cancer Institute (NCI) entitled Current Clinical Trials: Oncology, published in July/August 1995. That publication reported an ongoing study of HDC/PSCR:

> NCI HIGH PRIORITY CLINICAL TRIAL -- Phase III Randomized Comparison of Conventional CMF (CTX/ MTX/5-FU) Maintenance vs High-Dose Chemotherapy with CTX/TSPA/CBDCA plus Autologous Bone Marrow and Peripheral Stem Cell Rescue in Women with Metastatic Breast Cancer Responding to Conventional Induction Chemotherapy.

The existence of a clinical trial comparing HDC/PSCR with conventional therapy means that HDC/PSCR was still "the subject of ongoing Phase I, II, or III clinical trials." Therefore, HDC/PSCR was experimental and thus excluded from coverage under the plain terms of the Trustmark plan. By consulting independent experts and comparing their responses to the plain terms of the plan, the plan administrator acted reasonably.[2] The district court in turn properly declined to disturb the administrator's decision.

III.

In addition, Lewis appeals the dismissal of her fraudulent inducement claim. As noted, the district court held that this claim was preempted by ERISA. We need not address preemption because the record indicates that this claim must fail as a matter of state law. Lewis alleged in her complaint that "CSI and Roper approached Plaintiff in 1994 and represented to her that if she became an employee of CSI, she would be provided full and comprehensive cov-

_____

[2] By holding that the plan administrator reasonably found that HDC/PSCR was experimental, we need not address the administrator's alternative grounds for denying coverage under the plan.

8

erage for medical treatment for her breast cancer." CSI and Roper contend that this claim is factually flawed and that no one ever made a specific representation that HDC/PSCR treatment would be covered.

Summary judgment on the fraudulent inducement claim is certainly appropriate. Under Federal Rule of Civil Procedure 9(b), "the circumstances constituting fraud or mistake shall be stated with particularity." See also S.C. R. Civ. P. 9(b). Once past the pleading stage, a party must then prove the elements of fraud by clear and convincing evidence. Kerr v. State Farm Fire and Cas. Co. , 731 F.2d 227, 228-29 (4th Cir. 1984). Lewis has fallen far short of meeting this burden of proof. To establish fraud, there must be a false representation that is "predicated upon misstatements of fact rather than upon an expression of opinion, an expression of intention or an expression of confidence that a bargain will be satisfactory." Bishop Logging Co. v. John Deere Indus. Equip. Co., 455 S.E.2d 183, 187 (S.C. Ct. App. 1995). Statements of a vague and general character cannot be read to make representations of a specific character. See, e.g., Miller v. Premier Corp., 608 F.2d 973, 981 (4th Cir. 1979) ("[A]n unspecific and false statement of opinion such as occurs in puffing generally cannot constitute fraud."). Otherwise, claims such as Lewis' would render actionable a host of general positive statements about product quality. The terms "full" and "comprehensive" are vague, general terms that cannot be construed to make specific representations about the coverage of a particular form of experimental treatment.

Although Lewis now asserts on appeal that CSI and Roper made representations concerning coverage for HDC/PSCR, her complaint is at odds with her brief. She neither alleges in her complaint nor points to any evidence in the record demonstrating that any such representation was made. Instead, she claims to have relied on the generalized puffing of an employee lease-back sales agent about the overall quality of the health insurance coverage. A plaintiff "cannot simply cry fraud and thereby escape summary judgment." Strum v. Exxon Co., 15 F.3d 327, 331 (4th Cir. 1994). Because Lewis has failed to point to evidence demonstrating either a false statement of fact or that she reasonably relied on any such statement, we affirm the dismissal of her fraudulent inducement claim.

9

IV.

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>

10