**FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF SOUTH CAROLINA, Plaintiff–Appellee,**

v.

**CHRYSLER CREDIT CORPORATION, Defendant–Appellant.**

**FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF SOUTH CAROLINA, Plaintiff–Appellant,**

v.

**CHRYSLER CREDIT CORPORATION, Defendant–Appellee.**

**Nos. 92–1199, 92–1231.**

United States Court of Appeals, Fourth Circuit.

Argued Sept. 30, 1992.

Decided Nov. 30, 1992.

As Amended Jan. 5, 1993.

---

Daryl Lloyd Williams, Sinkler & Boyd, P.A., Columbia, S.C., argued (Elizabeth Anne Carpentier, Sinkler & Boyd, P.A., on the brief), for defendant-appellant.

Thomas Whatley Bunch, II, Robinson, McFadden & Moore, P.C., Columbia, S.C., argued (David W. Robinson, II, James M. Brailsford, III, Robinson, McFadden & Moore, P.C., on the brief), for plaintiff-appellee.

Before MURNAGHAN, NIEMEYER, and HAMILTON, Circuit Judges.

## OPINION

HAMILTON, Circuit Judge:

This case arises from the refusal of Chrysler Credit Corporation (CCC) to honor five checks made payable to Burdette Motors, Inc. (Burdette) and deposited in Burdette's checking account at First Federal Savings and Loan Association of South Carolina (First Federal). First Federal, which gave immediate credit for the checks that were drawn and exhausted immediately, sued CCC in state court for the amount of the checks plus interest. CCC removed the action to federal court on the basis of diversity. After deciding several pre-trial matters, with the consent of the parties, the district court referred the case to a Magistrate Judge for final disposition. 28 U.S.C. § 636.

CCC defended on the grounds that First Federal accepted the checks for deposit subject to CCC's defenses against Burdette. CCC also counterclaimed against First Federal for fraud, negligent misrepresentation and violation of various banking regulations as a result of losses it sustained by Burdette's demise.

After presentation of exhibits, testimony and closing briefs, the Magistrate Judge found in favor of First Federal with respect to the five checks, finding that although First Federal was merely a "holder" of the checks, CCC failed to prove a valid defense against payment of the checks. Pursuant to the order of reference from the district court, appeal was directly from the Magistrate Judge's order. This appeal and cross-appeal followed.

I

We largely adopt the factual findings of the Magistrate Judge, reflected herein, because they are based on substantial evidence and are not clearly erroneous. *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

In December 1979, Chrysler Corporation, CCC's parent corporation, appointed Burdette to be a retail automobile dealer in Sumter, South Carolina. As a result of that appointment, Burdette and CCC entered into a Security and Master Credit Agreement. The Security and Master Credit Agreement incorporated within it a Wholesale Financing Agreement. These Agreements obligated CCC to: (1) pay Chrysler Corporation for the cost of new vehicles delivered to Burdette, (2) reimburse Burdette for the cost of used vehicles purchased from wholesalers, and (3) reimburse Burdette for the costs of improvements to inventory, e.g. van conversions. Burdette, in turn, obligated itself to pay CCC for the financed vehicles as they were sold. Under both agreements, CCC had the right to audit Burdette's financial affairs, and it was given a security interest in each vehicle.

In 1988, Burdette and CCC entered into a third financing agreement, the Vehicle Financing Agreement, under which CCC would purchase retail sales contracts on vehicles sold at retail by Burdette to its customers.

Without question, Burdette was a troubling dealership for CCC. Burdette often failed to pay its obligations to CCC in a timely manner for sold vehicles, and according to CCC, sold vehicles "out of-trust," i.e., without reporting the sales to CCC and accounting for the proceeds. In 1982, Burdette bounced a check to CCC in the amount of $11,577. Furthermore, Burdette at one point exceeded its line of credit with CCC which resulted in a suspension of credit.

On or after September 28, 1988, First Federal learned that Burdette was "kiting" checks using an account it established at First Union National Bank (First Union). There is no evidence that CCC knew of the First Union account until on or after October 8, 1988, when it began extensive audits of Burdette. There was also no evidence that First Federal reported Burdette's check kiting to anyone. The result of the kiting of checks was that Burdette's First Federal account was substantially overdrawn.

After it learned of the kiting, First Federal refused to give immediate credit on Burdette's deposits except on CCC checks. As a result, checks written by Burdette were often presented for payment to First Federal when Burdette's checking account funds were nonsufficient (NSF) or uncollected.[1] First Federal would only dishonor these checks, however, if Burdette failed to make a deposit of a CCC check of a sufficient amount to cover the checks by the end of the day. If there were insufficient funds to cover all the Burdette checks that were presented for payment, First Federal would select which checks would be paid and which returned unpaid.

As the Magistrate Judge found, from the evidence of account activity, officials at First Federal must have been aware of Burdette's precarious financial position. First Federal charged the account with about 190 NSF charges in September and early October of 1988. The account activity showed clear reliance on CCC checks to maintain the cash position of Burdette. Without question, it is clear that some officer or employee at First Federal was monitoring Burdette's account closely.

In one instance, prior to learning of the kiting, First Federal returned three checks, issued on September 22, 1988, for nonsufficient funds without waiting on a CCC deposit. A letter written by Sandra Blanding, an employee of First Federal (the "Blanding" letter) was sent to CCC stating that the return was in error and apologizing for returning the checks.[2]

The Magistrate Judge felt the Blanding letter was "motivated by First Federal's unexplained efforts to assist Burdette in

---

1. "Uncollected funds" implies that a check was deposited that would cover the check written, but that it had not yet cleared. "Nonsufficient funds" means that there are not enough funds to pay the check even if recent deposits are considered.

2. These three checks were apparently covered by a single check subsequently written by Burdette to CCC.

some manner to conceal its insolvency from CCC." (Joint Appendix (J.A. 317)). This observation is supported by the fact that many checks were returned by First Federal in September and early October—as indicated by the numerous NSF charges—and yet no Burdette checks were apparently returned to CCC, even though CCC was Burdette's largest creditor. This fact casts doubt on the veracity of the letter and strongly indicates First Federal was indeed engaged in an effort to surreptitiously assist Burdette in maintaining the viability of its checking account without letting CCC know of Burdette's precarious position.

Shortly before or on October 6, 1988, First Federal finally returned to CCC four Burdette checks issued on September 28, 1988, and payable to CCC, totaling $210,878, for the alleged reason that they were drawn on uncollected funds. CCC received these checks on October 7, 1988. On October 6 and 7, 1988, CCC wrote five checks payable to Burdette totaling $108,875, which Burdette deposited in its checking account at First Federal on the same dates. The five checks are:

1. $19,741—for two retail contracts
2. $19,000—for two van conversions taken into inventory
3. $20,000—for two van conversions taken into inventory
4. $24,600—for one new conversion and two used cars
5. $25,534—for two retail contracts

First Federal credited Burdette's account for these checks and honored withdrawals based on the deposits, i.e., First Federal gave immediate credit for the five CCC checks deposited to Burdette's account. After inquiring about the four Burdette checks totaling $210,878 and being informed by First Federal that there were insufficient funds, as opposed to uncollected funds reported earlier, to pay the four Burdette checks, CCC issued a stop-payment order on its five checks payable to Burdette. CCC's bank subsequently refused to honor the five checks when they were presented for payment.

Immediately after learning the four Burdette checks would not be paid, CCC also began an intensive audit of Burdette the following weekend and learned that Burdette was hopelessly insolvent and out-of-trust.

The Magistrate Judge found that First Federal was not a holder in due course of the five stop-payment checks because it failed to meet the good faith standard. The Magistrate Judge also held, however, that CCC failed to prove it had defenses against payment of the five stop-payment checks. The Magistrate Judge awarded damages in the amount of the five stop-payment checks, $108,875, and interest from December 7, 1988 when First Federal demanded payment from CCC until January 14, 1991, one month after post-trial briefing. The interest was compounded at 8.75% per annum.

CCC appeals on the grounds that: (1) it proved defenses it had against Burdette which were also effective against First Federal; (2) it had a superior security interest in the checks which were proceeds of secured inventory; (3) First Federal participated in fraud with Burdette to induce CCC to continue issuing checks; and (4) the doctrine of unclean hands bars First Federal from recovering.

First Federal argues against the above and asserts that it was entitled to holder in due course protection and that CCC failed to prove damages. First Federal cross-appeals the Magistrate Judge's refusal to award interest at the statutory judgment rate of 14% per annum from the time the stop-payment order on the five checks was issued until the awarding of the judgment.

## II

 This matter was tried before a magistrate judge without a jury under 28 U.S.C. § 636. Findings of fact by a magistrate judge in an action tried without a jury may not be set aside unless clearly erroneous. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Conclusions of law are reviewed *de novo. Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1127 (4th Cir.1987).

### III

A holder in due course (HDC), is one who "takes the instrument: (a) for value; (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." S.C.Code Ann. § 36–3–302(1) (1976). A HDC is entitled to take the instrument free of most of the defenses a maker may have against payment. One who does not qualify as a HDC is a mere holder.

The Magistrate Judge determined that First Federal took the five stop-payment checks for value but that it did not take the instruments in good faith. The Magistrate Judge based this conclusion on the finding that First Federal knew of Burdette's precarious financial condition, knew that CCC was Burdette's largest creditor, and knew that Burdette could remain financially viable only on the strength of uncollected checks issued to Burdette by CCC. In spite of this knowledge, the Magistrate Judge noted, First Federal was "egregiously careless" when it selectively paid Burdette's checks in September and October.

■ First Federal argues that "good faith" pertains solely to the instrument. The holder's good faith is not, it argues, determined from extrinsic business relationships. The checks were voidable, it argues, only with respect to defenses inherent against the checks themselves, i.e., "duress, undue influence, forgery or failure of consideration in connection with the utterance of these checks or their endorsement to First Federal." (Appellee's Brief 21).

The requirements of good faith and notice of a defense go hand in hand. Although the good-faith requirement only relates to defenses to the payment of a check in question, those defenses are not limited to defenses inherent against the check itself. They include defenses with respect to the underlying attendant transaction. S.C.Code Ann. § 36–3–304 (1976) explicitly states that notice includes knowledge that "the obligation of any party is voidable in whole or in part...." The comments to § 3–304 state that the defense is not just to the instrument itself, but includes any defense, except set-off or counterclaim, "which will permit any party to avoid his original obligation...."

■ First Federal argues that, nevertheless, it had no actual knowledge of a defense to the underlying attendant transaction. Mere suspicion of a defense, it argues, is not enough. *Bank of Anderson v. Breedin*, 119 S.C. 39, 111 S.E. 799 (1922) [3]; accord *Farr–Barnes Lumber Co. v. Town of St. George*, 128 S.C. 67, 122 S.E. 24 (1924). These cases and others cited by First Federal are pre-UCC cases, and it is doubtful that they apply to define the UCC good-faith requirement. There is no reason to believe that South Carolina would differ from the general standard that lack of good faith is shown on actual notice *or* on knowledge of facts and circumstances that give rise to a defense or claim. Andrea G. Nadel, Annotation, *What Constitutes Taking Instrument in Good Faith*, 36 A.L.R. 4th 212 (1985).

■ It is clear that First Federal knew Burdette was in great financial difficulty. First Federal was aware that Burdette was check kiting and unable to pay its debts as they became due. First Federal clearly assisted in Burdette's "playing the float." [4] As the Magistrate Judge found, First Federal knew the nature of the relationship between Burdette and CCC. First Federal knew that Burdette had little expectation of paying checks it issued without a CCC deposit to cover them. The Magistrate Judge also found that it was clear that

---

**3.** In this case, the maker of the note told the president of the bank before he made the note that he did not want to pay cash because he didn't want to run the risk that the payee would not perform his part of the bargain after receiving payment. The court held that this, at most, was notice of suspicion which was insufficient to deny the bank, who purchased the note, from acquiring HDC status.

**4.** CCC points out that a bank is not entitled to HDC status when it knows of kiting. This is an obfuscation of the law; more accurately, the bank would not be entitled to HDC status on checks it knew may be kited. The five stop-payment checks were not checks which were kited.

immediately before the five stop-payment checks were deposited, First Federal knowingly returned four Burdette checks twice that amount payable to CCC. By this action, First Federal indisputably avoided a potential loss, due to Burdette's overdraft, by depositing the five stop-payment checks and refusing to honor the four Burdette checks totaling $210,878 which were payable to CCC. First Federal knew that Burdette was paying its obligation to CCC with CCC's money, and it knew that Burdette was a dealership which should have instead been paying CCC from prior receipts on vehicle inventory sold. It is beyond credulity to argue that these facts did not give notice to First Federal that CCC might be able to refuse payment to Burdette upon the dishonor of such a large amount owed to CCC.[5] *See Bank of Fort Mill v. Rollins*, 217 S.C. 464, 61 S.E.2d 41 at 55 (1950) (The "circumstances or suspicion [can be] so cogent and obvious that to remain passive would amount to bad faith.").

From the record in this case, it is quite apparent that the conduct of First Federal was somewhat less than professional and is not what is expected from a reputable financial institution of its type. Under these circumstances, First Federal could not be said to have acted in good faith. First Federal is, therefore, not entitled to HDC status.

### IV

Even if First Federal is not a HDC, however, the burden is upon CCC to prove a defense to payment of the five stop-payment checks. *Oklahoma National Bank*, 489 P.2d at 1337.

CCC first argues that it proved that Burdette breached the Wholesale Financing Agreement and the Vehicle Financing Agreement.

Under the Wholesale Financing Agreement, covering vehicle inventory financing, a default occurred if: (1) there was a failure to make payments when due, (2) there was a misrepresentation, or (3) whenever CCC "deems itself insecure for any reason." The agreement contained cross-collateralization clauses that created a lien on the vehicle for any past or future indebtedness in addition to the indebtedness on that particular vehicle. CCC had the right, upon default, to refuse further advances under the Wholesale Financing Agreement. In addition, CCC retained a security interest in proceeds from the sale of inventory.

CCC claims that it showed at trial that Burdette sold hundreds of thousands of dollars of vehicle inventory out-of-trust, i.e., without reporting the sales to CCC or properly accounting for the proceeds. According to CCC, therefore, Burdette was in breach of the Wholesale Financing Agreement.

The Wholesale Financing Agreement, however, only gives CCC the right to refuse to advance *future* funds to Burdette. It does not give the right to recoup funds already advanced to Burdette or the right to set-off obligations between the parties. The Magistrate Judge specifically made this finding, and it is not clearly erroneous.

Furthermore, it is not at all clear from the record that CCC proved default on prior vehicle car sales, including the vehicles which were the object of the five stop-payment checks, or that Burdette was out-of-trust. CCC does not cite or discuss its "evidence" of such defaults. In considering the defaults of Burdette, the Magistrate Judge found that the evidence did not show any default under the attendant transactions which were the subject of the five stop-payment checks. From the record, we cannot say that this finding is

---

**5.** First Federal argues that CCC was trying to "set-off" what it owed to Burdette against what Burdette owed to it. A mere right of set-off is excluded as an applicable defense by § 3–304. The facts in this case indicate that First Federal was on notice; not of a right of set-off, but of

possible fraud and breach of contract by Burdette. *See Oklahoma National Bank v. Equitable Credit Finance Co.,* 489 P.2d 1331 (Ok.1971) (a bank that knows its depositor is repaying the financier, not from collected receivables, but

clearly erroneous.[6]

Under the Vehicle Financing Agreement, a default occurs whenever Burdette failed to pay a debt due and owing to CCC. Upon default by Burdette, CCC could refuse to purchase any additional retail sales contracts generated by Burdette. In addition, CCC had no obligation to make any payment to Burdette from the reserve account until it was fully paid on all retail sales contracts CCC had previously purchased. CCC argues that this constitutes a right of set-off against any amounts it may owe to Burdette.

Just as the Magistrate Judge correctly found with respect to the Wholesale Financing Agreement, the Vehicle Financing Agreement also fails to give CCC the right to recoup funds already advanced or give the right of set-off. It is silent on CCC's right to offset the amount it owed against what Burdette owed. It only provided that CCC had no obligation to purchase additional retail sales contracts in the event of default by Burdette. Furthermore, as discussed above, CCC failed to prove that a default by Burdette occurred.[7] CCC, therefore, failed to prove a defense to payment of the checks.

■■■■ CCC argues that First Federal induced it to continue making payments to Burdette via the Blanding letter dated September 28, 1988. Such fraudulent inducement, it argues, is a valid defense against a contract, and hence, against payment of

the five stop-payment checks. The Blanding letter was fraudulent inducement, CCC continues, because it represented that Burdette had funds to issue checks to CCC on September 27 when in fact, Burdette was overdrawn and in serious financial trouble. First Federal's motive, CCC argues, was to obtain enough funds to cover the overdrafts generated by Burdette from its kiting activity. Fraudulent inducement on the part of First Federal, however, would not be a defense to the transaction between Burdette and CCC and hence would not be a defense to payment of the five stop-payment checks to a subsequent holder. Such a claim is correctly cast only as a separate cause of action for fraud.[8]

V

■■■■ With respect to its counterclaim for fraud, CCC argues that the Magistrate Judge erred in ruling that it did not prove the elements of fraud:

[M]isrepresentation of a material fact, made with knowledge of its falsity or ignorance of its truth, and intended by the maker to induce action in reliance; lack of knowledge by the other that the fact represented is false; reasonable reliance by the other upon the fact, and harm proximately caused by the reliance.

*Miller v. Premier Corp.*, 608 F.2d 973, 980 (4th Cir.1979).

CCC had the burden of proving fraud by "clear and convincing evidence." *Lundy v.*

from the financier's new advances is not acting in good faith).

6. CCC argues that it did not have to prove default on the vehicles that were the subject of the five stop-payment checks and that proof of any prior default was sufficient. However, it is apparent from the record that CCC failed to prove any prior default by Burdette. Furthermore, CCC had previously excused Burdette's alleged but unproven selling out-of-trust and deception. (Magistrate Judges's Findings of Fact, J.A. 312–313).

7. CCC argues that it had a security interest in the proceeds of Burdette's inventory superior to First Federal's interest. *See, e.g., General Motors Acceptance Corp. v. Norstar Bank, N.A.,* 141 Misc.2d 349, 532 N.Y.S.2d 685 (N.Y.Sup.Ct.1988) (lienholder of proceeds from sale of inventory

has priority over bank). However, CCC never proved that any "proceeds" were generated from the sale of financed vehicles, or that Burdette or the customer somehow defaulted on the retail sales contracts. CCC, therefore, had no right to exercise its security interest. CCC alleges, in general, that vehicles were sold out-of-trust, but failed to prove its allegation.

8. CCC also asserts that the doctrine of "unclean hands" should bar First Federal from recovery. It is doubtful that this equitable doctrine is applicable in the UCC context. Even if it were to apply, the doctrine is closely analogous to the "good faith" requirement for HDC status. *Gray v. Thomas,* 163 S.C. 421, 161 S.E. 743 (1931). Just as the failure to prove good faith in this case does not defeat First Federal's right to recover as a holder, the doctrine of unclean hands does not defeat First Federal's claims.

*Palmetto State Life Ins. Co.*, 256 S.C. 506, 183 S.E.2d 335 (1971). There was no proof that CCC relied upon the Blanding letter, even if it was a misrepresentation. CCC was aware of Burdette's precarious financial condition and continued to deal with it. Furthermore, CCC had full access to Burdette's records and thus did not reasonably rely upon the Blanding letter. Because there was no reasonable reliance proven, CCC's fraud and negligent misrepresentation claims fail.

## VI

■ The Magistrate Judge awarded interest from December 7, 1988, when First Federal made demand for payment, until January 14, 1991. "At the risk of error" (J.A. 336), he refused to award interest for the twelve-month period immediately preceding his January 14, 1992 order. The Magistrate Judge's rationale was that it would not be equitable to penalize CCC for his delay in reaching a decision. The purpose of pre-judgment interest is to compensate, not penalize. CCC admits, however, that it could find no support for the proposition that a judge may curtail the running of interest.

The award of interest on dishonored checks is governed by S.C.Code Ann. § 36–3–122(4) which is based on Uniform Commercial Code § 3–122(4). This section states that "interest runs at the rate provided by law for a judgment." Although the common law rule gave a court discretion in awarding interest, this section requires an award of interest on dishonored checks which runs from the date of demand to the date of final judgment. *See, e.g., First American Bank of Virginia v. Litchfield Co. of South Carolina, Inc.*, 291 S.C. 240, 353 S.E.2d 143 (1987); *North Ave. East Check Cashing v. Aluf Plastics, Inc.*, 212 N.J.Super. 593, 515 A.2d 1253 (1986); *Fort Pierce Toyota Inc. v. Wolf*, 345 So.2d 348 (Fla.App.1977); *Schwab v. Norris*, 217 Va. 582, 231 S.E.2d 222 (1977); *Hatcher v. Weatherall*, 551 S.W.2d 179 (Tex.Civ.App. 1977).

Although no court has apparently considered whether a court may curtail the running of such interest, such action is inconsistent with the mandatory nature of the award. As such the Magistrate Judge erred in curtailing the running of interest.

■ The question remains, however, as to what rate of interest should be applied. S.C.Code Ann. § 36–3–122(4) refers only to the "judgment rate." First Federal argues that the judgment rate of interest was 14% per annum. S.C.Code Ann. § 34–31–20(B) (1976), which covers post-judgment interest on decrees and judgments, does indeed state that interest on a judgment is applied at 14% per annum. This section would seem to be the judgment rate which § 3–122(4) refers to. S.C.Code Ann. § 34–31–20(A), however, provides for an 8.75% per annum interest rate on any sum or sums "ascertained" and "due." Absent the specific use of the words "judgment rate," in § 122(4), the prejudgment rate expressed in § 34–31–20(A) would seem to most logically apply to interest on dishonored checks from the time of demand until the final judgment.

In *First American Bank v. Litchfield Co.*, 291 S.C. 240, 353 S.E.2d 143 (Ct.App. 1987), although not specifically noting the statutory discrepancy, the court affirmed an award of pre-judgment interest in the amount of 8.75% per annum in a case where a bank recovered on a negotiable instrument as a HDC. While First Federal argues that this was error, other state courts have treated their state's enactment of UCC 3–122 in a similar fashion. *Schwab*, 231 S.E.2d at 223 (applying the prejudgment "legal" rate of interest under Va.Code § 6.1–330.53, as opposed to the post-judgment "judgment" rate of interest under Va.Code § 6.1–330.54); *Lignell v. Berg*, 593 P.2d 800 (Utah 1979) (applying the Utah "legal" rate of interest under Utah Code Ann. § 15–1–1 as opposed to the "judgment rate" of interest under Utah Code Ann. § 15–1–4); *Wood v. Kelly*, 359 So.2d 742 (La.App.1978) (applying the "rates of legal and conventional interest" under LSA–C.C. art. 2924, as opposed to judgment rates of interest provided for in other statutes).

Given the decision of the Court of Appeals of South Carolina in *Litchfield* and other state courts' interpretation of § 3–122, it was not erroneous for the Magistrate Judge to apply the 8.75% per annum prejudgment rate of interest under S.C.Code Ann. § 34–31–20(A).

V

In summary, while First Federal was not entitled to HDC status with respect to the five stop-payment checks, it was nevertheless a holder and entitled to recover the value of the checks, plus prejudgment interest, by virtue of the fact that CCC failed to establish a defense against payment of these checks. We, therefore, affirm the Magistrate Judge's findings of fact and decisions of law with the exception that the judgment is modified to award interest at 8.75% per annum from December 7, 1988, until the date of judgment, January 14, 1992.

AFFIRMED AS MODIFIED.